THE STATE OF MONTANA, PLAINTIFF AND RESPONDENT, *v.* DUNCAN PEDER McKENZIE, JR., DEFENDANT AND APPELLANT.

No. 13011.
Submitted Oct. 29, 1979.
Decided Feb. 26, 1980.
Dissenting Opinion March 28, 1980.
Rehearing Denied March 31, 1980.
608 P.2d 428.

486

See **C.J.S.**, Criminal Law, § 1975.

488

Barney Reagan, Cut Bank, Charles L. Jacobson (argued), Conrad, for defendant and appellant.

Mike Greely, Atty. Gen., Chris Tweeten, Asst. Atty. Gen. (argued), Helena, Douglas Anderson, County Atty., Conrad, for plaintiff and respondent.

MR. CHIEF JUSTICE HASWELL, delivered the opinion of the Court.

Following a jury trial, the defendant was convicted of deliberate homicide by means of torture and aggravated kidnapping. The defendant was sentenced to death. The judgment and sentence were affirmed by this Court in *State v. McKenzie* (1977), 171 Mont. 278, 557 P.2d 1023. The United States Supreme Court granted certiorari and remanded the case for further consideration in the light of its decision in *Patterson v. New York* (1977), 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281.

This court then reconsidered the entire record and again affirmed. *State v. McKenzie* (1978), . . . Mont. . . . , 581 P.2d 1205, 36 St.Rep. 759. The United States Supreme Court granted certiorari, vacated the judgment of this Court, and again remanded the case for further consideration in the light of *Sandstrom v. Montana* (1979), 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39. *McKenzie v. Montana* (1979), —— U.S. ——, 99 S. Ct. 3094, 61 L.Ed.2d 871. This opionion constitutes our consideration of this case in the light of *Sandstrom*.

The victim in this case was Lana Harding, a 23 year old rural school teacher in Pondera County, Montana. On Tuesday morning, January 22, 1974, she failed to appear at school. At the Pioneer School teacherage where she lived the bed was found in a disheveled condition. The sheriff of Pondera County was called and officers were dispatched to the school arriving there midmorning.

Investigation that day revealed (1) a red tennis shoe belonging to Lana Harding just outside the school, (2) a drag trail from the teacherage to a nearby road, (3) blood near the end of the drag trail (later identified as Lana's type and RH factor) and (4) a wrist watch belonging to Lana in the same area as the blood. Lana Harding was last seen in Conrad, Montana, 13 miles from the teacherage on Monday, January 21, at about 5:00 p.m.

Defendant had recently moved into the community and was working for the K & K Wholesale Seed Company, located approximately three miles from the Pioneer School teacherage. A day or so before January 21 he made arrangements to buy a 1948 black Dodge pickup, recognizable to most inhabitants of the area because it had belonged to one local owner for a long period of time. On January 21 defendant had worked on the pickup after work. He was seen leaving K & K Wholesale Seed Company at approximately 6:45 p.m. in his black pickup headed toward his place of residence not far from the teacherage. The pickup was seen about 7:00 p.m. about a mile from the teacherage.

Approximately an hour later, around 8:00 p.m. defendent knocked on the door of the Pearson farm residence located across the road from the teacherage. He asked for assistance in starting his pickup. It was later determined his pickup was parked in the road at a point where the drag trail ended and where the blood and watch were found the following day. At the Pearson residence defendant asked directions to his own residence and called his wife to say he was coming home. Don Pearson pulled the pickup, got it started and noted defendant did not drive on towards his place of residence. Shortly thereafter, the pickup was seen being driven toward the drill where Lana's body was found the following day.

Her body was found clothed only in a shirt sweater and bra. It was draped over the tongue of a grain drill. She had been severely beaten about the head and body. The forensic pathologist who examined the body testified the death blow had been delivered to the head and laid open the right side. A rope was tied around her neck; there was evidence she had been strangled; however pressure had been released so she did not die of strangulation. A coil of wire was entangled in her hair, later shown to have come from a roll of wire found in the back of defendant's pickup.

During the search for the body and the investigation of the homicide three additional items were found: (1) A pair of gloves worn by defendant at work were found in a field not far from where the body was discovered with human blood on them, (2) overshoes with Lana's·type blood and brain tissue on them were found about a quarter of a mile away, and impressions from the soles matched the heels of boots later taken from defendant's home; and (3) Lana's purse was found near the place where the overshoes were covered.

As a result of the investigation by the sheriff and his deputies, the county attorney, on Tuesday afternoon, January 22, filed a complaint charging defendant with assult before the justice of the peace. The county attorney also obtained a warrant for the arrest of defendant and a search warrant.

Defendant was thereafter arrested at his home. The black Dodge pickup was seized and impounded and blood was found in the bed of the pickup and on the springs; the back end of the pickup had been recently sprayed with black paint; the spray paint was later identified by FBI experts as identical to paint brand-name "Weekend" which was not available in the Conrad Pondera County, Montana area. A can of the black spray paint was found in the cab of the pickup and another was later found at defendant's home.

The following items were found in the back of the pickup: (1) a coil of wire later indentified as having been the source of wire found in the victim's hair, (2) an exhaust manifold that had been

painted black, and (3) human blood of the same kind and RH factor as Lana's and brain and corticle tissue were found on the manifold. Dr. John Pfaff, who examined the victim's body and the manifold, testified that the manifold could have inflicted the fatal blow.

At the drill site where the body was located, a piece of brass from a water pump was found. The prior owner of the Dodge pickup testified this piece of brass was in back of the pickup when defendant took possession of the pickup on January 19.

Several co-workers at the K & K Wholesale Seed Co. testified at trial that defendant had said on January 21 that he broke in every new vehicle by engaging in sexual intercourse in each newly acquired vehicle. Several days before defendant had remarked that he had had intercourse with country school teachers; and that they were naive, he could teach them, and they were easy to get.

Subsequently defendant was charged with several crimes to which he entered pleas of not guilty. Following trial, he was convicted by a jury of the crimes of deliberate homicide by means of torture and aggravated kidnapping. Judgment was entered thereon and a death sentence imposed. Defendant appealed.

We have reconsidered the entire case, not only in the light of *Patterson* and *Sandstrom*, but also on all issues raised in the original appeal. This opinion constitutes this Court's judgment in the entire case following remand.

In the interest of an orderly presentation of the specifications of error raised by defendant, we reorganize and present them insofar as possible in chronological sequence. Although there is some overlap, the issues on appeal generally fall into four categories: (1) Those relating to pretrial proceedings, (2) those involving the trial itself, (3) issues involving post-trial proceedings, including but not limited to, imposition of the death sentence, and (4) issues for reconsideration upon remand from the United States Supreme Court.

Defendant's specifications on appeal are:
1. the issuance and execution of the arrest and search warrants

without probable cause, including all claims of error flowing therefrom.

2. Errors relating to the District Court's refusal to permit defendant to change his plea and enforce a plea bargain.

3. Denial of defendant's motions for substitution of the trial judge.

4. Permitting the filing of amended Informations against the defendant and matters relating thereto.

5. Denial of a speedy trial to defendant.

6. Denial of defendant's motions for a protective order and the constitutionality of Montana statutes relating thereto.

7. Denying defendant the right to voir dire the jury on legal concepts relating to defendant's mental state.

8. Permitting the State to endorse 58 additional witnesses on the amended Information of the first day of trial.

9. Failure of the State to timely furnish defendant with statements of its witnesses.

10. Improperly admitting in evidence numerous State's exhibits and denying admission in evidence certain proposed exhibits of defendant's.

11. Improperly instructing the jury.

12. Improper jury verdict forms.

13. Permitting audience recording of the State's closing argument to the jury.

14. Undue interference and partisan attitude by the trial court preventing an orderly and proper presentation of the case.

15. Insufficiency of the evidence to support the verdict.

16. Denial of defendant's motion for a new trial.

17. Errors in the court's "findings, conclusions, sentence and order" resulting in the imposition of the death sentence.

18. On remand from the United States Supreme Court, the issue of whether the trial court's instructions improperly shifted the burden of proof of defendant's state of mind, an essential element

of the crimes of which he was convicted, onto the defendant in violation of due process under the federal and state constitutions in the light of *Patterson* and *Sandstrom*, including issues relating to harmless error.

In connection with the first issue above, defendant contends that the arrest and search warrants were not issued on probable cause in violation of United States and Montana constitutional requirements; that the facts supporting probable cause were not made under oath or affirmation and reduced to writing in violation of the Montana Constitutional requirements; that the search warrant was either issued as or converted into a prohibited general search warrant; that section 95-1806(f), R.C.M.1947, is unconstitutional under the United States and Montana Constitutions; that by reason thereof State's exhibits 17, 18, 20, 21, 22, 26, 27, 31, 32, 33, 34, 35, 39 through 52, 83 through 100, and sublettered exhibits bearing any of these numbers are inadmissible of the products of an unlawful search and seizure; and that defendant's motions to supress and objections to these exhibits should have been granted.

■ We disagree with defendant's contention that there was no probable cause for the arrest or search warrant. This Court in *State ex rel. Garris v. Wilson* (1973), 162 Mont. 256, 511 P.2d 15, considered federal case law and the long-standing rule in this jurisdiction on probable cause for arrest and search warrants noting:

"We reach this decision by application of the following standards: *only a probability of criminal conduct need be shown.*'"

Far more was shown here. See: *State v. Troglia* (1971), 157 Mont. 22, 482 P.2d 143; *Spinelli v. United States* (1969), 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637.

Defendant argues the search warrants must fail on the basis of failure on the part of the county attorney to swear or affirm and reduce the testimony to writing. He relies on *State ex rel. Townsend v. District Court* (1975), 168 Mont. 357, 543 P.2d 193; and *Petition of Gray* (1970), 155 Mont. 510, 473 P.2d 532. We find neither case factually applicable here.

Article II, Section 11, 1972 Montana Constitution provides:

". . . No warrant to search any place, or seize any person or thing shall issue . . . without probable cause, supported by oath or affirmation reduced to writing."

In *Townsend* nothing was reduced to writing. Here, there is an affidavit signed by the county attorney and made a part of both warrants. At a later date, defendant argues the justice of the peace failed to follow rituals of the swearing. County Attorney Nelson later testified he asked the justice of the peace "if he was sworn."

Defendant argues the county attorney made the affidavit only on facts obtained from Jerry Hoover, a deputy sheriff of Pondera County, who had been at the scene of the crime as part of the investigating team. This is not a true picture of what took place before Justice of the Peace Wolfe at the time the county attorney gave the affidavit and obtained the warrants.

On September 30, 1974, a hearing on the defendant's motion to suppress was held before Judge Robert J. Nelson. Testifying were Sheriff Hammermeister, his deputy sheriff Jerry Hoover, Justice of the Peace Robert Wolfe and County Attorney David H. Nelson. The arguments of defendant's counsel were directed to the lack of probable cause for the issuance of the warrants.

A summary of the testimony shows Justice of the Peace Wolfe testified he customarily swears all witnesses though he did not recall swearing in the county attorney, he considered him sworn. Deputy sheriff Hoover testified he came into town about 4:30 p.m. on January 22, 1974, with directions to go to the county attorney's office; that he helped the county attorney prepare the affidavit and he then went before Justice of the Peace Wolfe and gave sworn testimony in support of the issuance of the warrants. County Attorney Nelson testified he had been at the scene with the sheriff and his deputies during the afternoon and just prior to his coming to town to get the warrants issued. At the hearing, he said in answer to a question as to what knowledge he had of the facts:

"A. Well, without looking at the affidavit now—I think the first paragraph or two is my statement as to what I determined, that she

was missing and may have been the victim of foul play but of what nature we didn't know at the particular time, and that she resided at the teacherage."

In addition, the county attorney examined Deputy Hoover before the-justice of the peace as to facts he learned during the investigation. Here, unlike *Gray*, there was, in effect, sworn testimony by the county attorney and deputy sheriff in addition to the affidavit, and the combination thereof established probable cause. The fact that defendant had been parked at the roadside near the school the night before had been established by the Pearsons, who assisted defendant in getting the truck moved. It was there the victim's watch was found in a pool of blood by the investigating officers before going to town to get the warrants. See: *Lindley v. State* (1956), Okl.Cr., 294 P.2d 851.

■ This, in our opinion, is a sufficient showing of probable cause to issue the warrants.

■ Defendant next attacks the specificity of the search warrant, alleging that under the search warrant issued, a blanket seizure resulted. Examination of the warrant indicates that both the house and the vehicle were to be searched. Though an error on the vintage of the black Dodge pickup (1950 instead of 1948) appeared, that is of little significance. *State ex rel. Flournoy v. Wren* (1972), 108 Ariz. 356, 498 P. 2d 444. All parties knew the pickup involved. All that is needed to meet the requirements of specificity is that the officer with reasonable effort, can ascertain the automobile intended to be searched, and its owner, if possible. *Wangrow v. United States* (8th Cir. 1968), 399 F.2d 106. Defendant cites case authority that some seven criteria are needed for identification of a motor vehicle—owner, make, model, year, color, motor number and license number. Here, the affidavit for the search warrant answers five of the seven listed criteria and it was sufficiently specific. *Wilkerson v. Commonwealth* (1923), 200 Ky. 399, 255 S.W. 76; *Hatley v. State* (1941), 72 Okl. Cr. 69, 113 P.2d 396.

■ Defendant's argument that the items seized were not

covered by the language "any other contraband articles" is without merit. The language used comes within the rule of *State v. Quigg* (1970), 155 Mont. 119, 467 P.2d 692, where we held that items other than those specifically described in the search warrant may be seized as long as a reasonable relationship is demonstrated between the search authorized in the warrant and seizure of the items not specifically described therein.

Next we consider the constitutionality of section 95-1806(f), R.C.M.1947, which states:

"The burden of proving that the search and seizure were unlawful shall be on the defendant."

■ We find no merit in defendant's contention this subsection is unconstitutional. We note defendant cites no authority for his position and therefore fails to overcome the presumption of constitutionality. *United States v. Keleher* (1924), 55 App.D.C. 132, 2F.2d 934, relied upon by defendant, is not applicable to the facts here. We note that Montana's statute section 95-1806(f), R.C.M. 1947, is patterned after Chapter 38, § 114-12(b), Ill.Code of Criminal Procedure, which states in part:

". . . The judge shall receive evidence on any issue of fact necessary to determine the motion and the burden of proving that the search and seizure were unlawful shall be on the defendant. ."

Here, such a hearing was held by the trial court, and defendant failed in his effort. *People v. Normant* (1975), 25 Ill.App.3d 536, 323 N.E.2d 553; *State v. Tritz* (1974), 164 Mont. 344, 522 P.2d 603.

Defendant next specifies reversible error arising out of an alleged "plea bargain", an alleged breach thereof by the State, a refusal by the District Court to specifically enforce the terms thereof, and a refusal by the District Court to permit the defendant to withdraw his prior plea and substitute a plea of guilty in conformity with the alleged plea bargain.

In substance the defendant contends that a valid and binding agreement was made on December 22, 1974, between the prosecutor and defense counsel, subject to approval by the trial judge, that

defendant would plead guilty to deliberate homicide and aggravated assault and would receive sentences of 50 years and 20 years respectively to be served concurrently. Defendant claims that on the following day counsel met with the trial judge, who with some reluctance, agreed to all aspects thereof (except that he felt he could only give one 50 year sentence for both crimes) and set December 30 as the date for change of plea and entry of judgment in accordance with the agreement. As a result, according to defendant, defense counsel agreed to explain what problems they foresaw in the prosecution of the State's case and what the defense position would have been had the case gone to trial, all to counteract anticipated public reaction by the sheriff and the family of the victim.

On December 28 the prosecutor advised defense counsel they would not perform their part of the plea bargain agreement, according to defense counsel. On December 30 the District Court denied defendant's motion to withdraw his plea and refused to enforce the alleged plea bargaining agreement.

The State, on the other hand, denies that any plea bargaining agreement was entered into on December 22, or at any other time. The state contends the initiation and impetus for the plea bargaining discussions came from the defendant; that throughout the discussions the State consistently took the position that no plea bargain could be entered into without the consent of the victim's family and the sheriff and that the only reason the State agreed to meet with the trial judge and defense counsel on December 23 was that the prosecution was unable to travel some 400 miles to see the victim's family until December 26. Because no consent could be obtained from the victim's family, no further plea bargaining discussions were held. The State asserts any gratuitous information that defense counsel believed they had imparted to the State was either already known to the State or of no significance to the prosecution's case.

■ This issue turns on the existence of the alleged plea bargaining agreement. The trial judge accepted the State's version of the situation and refused to enforce the alleged agreement contended

for by defendants. We likewise accept the State's version. We hold that where, as here, the existence of any plea bargaining agreement was disputed and there is substantial evidence that none was made, there is nothing to enforce and the trial court's actions in this regard were correct.

As we understand it, there is neither contention nor proof of bad faith by the State in its discussions with defense counsel on a plea bargain or in its effort to secure the approval of the sheriff or the victim's parents. Under these circumstances any statements of defense counsel concerning weaknesses in the State's case or defense positions in connection therewith were gratuitous and premature. In any event, a trial is not a sporting contest in which the verdict turns on nondisclosure of such matters. Discovery procedures are designed and operated to remove this element and had been extensively and exhaustively utilized at the time in question.

*Santobello v. New York* (1971), 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427, does not aid the defendant here as that case is clearly distinguishable on the facts and on the law.

Defendant's next specification of error concerns the denial of his motions for substitution of the trial judge. He argues that he attempted to disqualify the trial judge for cause by motion and hearing on September 30, 1974, on the basis that the trial judge was a member of the Criminal Law Revision Commission that drafted Montana's present Criminal Code and submitted it to the legislature for enactment. He argues that he again attempted to disqualify the trial judge for cause on December 30, 1974, first, because the trial judge had acquired information during the plea bargaining process making it impossible for him to sit in an impartial manner, and second, because he was attempting to force his own "Preliminary Instructions to the Jury" over both prosecution and defense objections which indicated he had assumed an adversary stance and taken over prosecution of the case.

We hold that the trial judge's membership on the Criminal Law Revision Commission did not per se constitute grounds for disqualification for cause. Canon 4 of the American Bar Association

Canons of Judicial Ethics specifically permits this: "A Judge may engage in activities to improve the law, the legal system, and the administration of justice." The draft of the revision of the Criminal Code by the Commission was presented to the legislature for its consideration, approval, rejection or modification.

 Nor do we find any ground for disqualification of the trial judge for cause in his acquisition of information during the plea bargaining process, his drafting of "Preliminary Instructions to the Jury", or any facts or proof that he had assumed an adversary position at trial in taking over the prosecution of the case. The rule of *United States v. Grinnell Corp.* (1966), 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778, is inapplicable to establish bias and prejudice. Here, whatever knowledge the trial judge obtained was during the course of legal proceedings in the case and not from any outside source. As long as the trial judge's "Preliminary Instructions to the Jury" are a correct statement of the law, it is immaterial whether they are drafted by the judge or given over the objections of one or both adversary counsel. Such is the case here for reasons hereafter discussed. Finally, we find the record does not support defendant's contention the trial judge assumed an adversary role and took over the prosecution of the case.

 Defendant argues as error the District Court's rulings permitting the State to file amended Informations against him. We need only concern ourselves with the filing of the third amended Information as it was this Information on which defendant was ultimately tried. The third amended Information conforms to our opinion and directions in *State ex rel. McKenzie v. District Court* (1974), 165 Mont. 54, 525 P.2d 1211. Thus, there is no error in the affidavit, the Information, or the District Court's rulings in permitting its filing.

 Defendant complains he was denied a speedy trial, emphasizing a lapse of 350 days between arrest and trial. This delay cannot be considered per se a violation of defendant's rights to a speedy trial. However, the length of time between defendant's arrest and trial does shift the burden of explaining the reason for the

delay and showing absence of prejudice to defendant upon the prosecution. *Fitzpatrick v. Crist* (1974), 165 Mont. 382, 528 P.2d 1322; *State v. Keller* (1976), 170 Mont. 372, 553 P.2d 1013. The State's explanation for the delay was defendant's several appearances in this Court, the difficulties arising from the defendant's refusal to plead, and the difficulties which arose because this was the first homicide prosecuted under the new Montana Criminal Code and under the new capital punishment scheme. Much of the time can in fairness be charged to neither party, but it is clear that it aided both parties to better prepare for trial, this being a complex circumstantial case. Under those circumstances, we cannot see that defendant was denied his right to a speedy trial. The State's explanation of the delay is satisfactory and shows that defendant was not prejudiced by the length of time between arrest and trial.

Defendant contends the Montana provision for notice of mental defect or disease and the mental defect or disease provisions in the Code of Criminal Procedure, sections 95-501 through 509 and section 95-1803(d), R.C.M.1947, are unconstitutional. To challenge the constitutionality of these sections, defendant sought a protective order to protect himself from any waiver of rights were he to give the notice required by these sections. The court denied the relief sought and held these sections to be constitutional and not violative of the United States or Montana Constitutions. On appeal, defendant maintains the court erred in not holding these provisions unconstitutional.

Defendant's constitutional agruments were previously answered by this Court in *State ex rel. Sikora v. District Court* (1969), 154 Mont. 241, 462 P.2d 897. Defendant's attack on these statutes loses much of its force when it is recognized that the United States Supreme Court promulgated, and Congress, after careful consideration, approved Rule 12.2 Federal Rules of Criminal Procedure, Notice of Defense Based upon Mental Condition, which is nearly identical to the procedure attacked here. It should be emphasized that the purpose of the statute is for notice, to prevent sur-

prise, and to eliminate the necessity for a continuance of a trial when the defense is raised. The fact of notice does not amount to a plea, and it could not be used in any way as evidence in a trial on the merits. The provisions merely provide for advance notice of the intent to rely on such defense so that the State may be prepared to meet this defense.

Defendant claims prejudice because he was not allowed to voir dire the jury on the subject of mental disease or defect. This Court has previously said that where notice of a defense of mental disease or defect is given a refusal to allow defendant to voir dire the jury on this defense constitutes prejudicial error. *State v. Olson* (1971), 156 Mont. 339, 480 P.2d 822. Here, defendant did not give any notice. We believe defendant was properly not allowed to voir dire the jury on mental disease or defect as he did not give any notice of this defense.

Defendant also alleges the addition of the names of 58 new witnesses to the amended Information on the day of trial was error.

The pertinent section of the code of Criminal Procedure is section 95-1803(a)(1), R.C.M.1947, which reads:

"(a) List of Witnesses:

(1) For the purpose of notice only and to prevent surprise, the prosecution shall furnish to the defendant and file with the clerk of court at the time of arraignment, a list of the witnesses intended to be called by the prosecution. The prosecution may, any time after arraignment, add to the list the names of any additional witnesses, upon a showing of good cause. The list shall include the names and addresses of the witnesses."

The Revised Commission Comment on this section points out:

"Section 95-1503(d) of Chapter 15 requires the State to endorse the names of the witnesses for the state on the indictment or information. The motion under this section permits the defendant to get a list at any time, probably after arraignment and before trial. Many times the state does not know before it files the indictment or information all the witnesses it may call.

"Further, this provision allows the addition of names not only prior to trial, but after the trial has commenced. As the trial progresses, the showing which is necessary to establish 'good cause' should be more stringent. At any time, the judge may allow a continuance (section 95-1708) if it should appear necessary in the interest of justice."

In *State v. Campbell* (1972), 160 Mont. 111, 500 P.2d 801, the person whose name was added was the victim of the assault and the Court there found no serious claim of surprise and pointed out that while defendant objected, he made no effort to ask for a continuance. In *State v. Rozzell* (1971), 157 Mont. 443, 486 P.2d 877, the District Court judge recognized the possibility that the witnesses added would surprise the defendant and offered to continue the trial until the defendant had had a chance to interview all the new witnesses, but this was refused.

These cases clearly indicate that the proper procedure where surprise is claimed from the addition of new witnesses is to ask for a continuance so that defendant may prepare. In the present case, defendant objected to the addition of the witnesses based on surprise and inability to prepare his defense, but never requested a continuance. The District Court in granting the State's request for the addition of the new witnesses cautioned:

". . . and in granting this motion, it must be understood before any of these witnesses is allowed to testify, the defendant must be given an opportunity to have his counsel talk with them, examine them * * *"

The witnesses added were not prejudicial to defendant. The addition of the names of the FBI agents did not surprise defendant, as he knew the content of their testimony from reports received several months earlier. The rest of the additional witnesses who were actually called to testify were employees of Wright Chevrolet. These persons' testimony was a part of the chain of possession of the evidence seized from the truck. The remainder of the witnesses whose names were added, but who were not called to testify, were named because they could, if need be, corroborate the testimony of

the already listed witnesses, lay further foundation, or testify about the weather and temperature in the area on the dates in question.

In its order the court was careful to provide defendant with protection against surprise and to ensure that defendant was able to prepare for the testimony. Defendant was in no way prejudiced by the addition of these witnesses. Before allowing the addition of the new witness names, the court examined the county attorney to determine the reason for the addition of each new witness and to find out the nature of each of the witness' testimony in the presence of defendant's counsel, so that defendant was apprised of the basic nature of the testimony.

Defendant contends the State failed to timely furnish him with statements of its witnesses. He argues that this is reversible error.

Sections 95-1801(d)(1), (d)(2) and 95-1804(a), R.C.M.1947, provide the basic discovery tools. Section 95-1804(a), R.C.M. 1947, provides:

"On Motion of a defendant in any criminal case made prior to trial the court shall order the state to furnish the defendant with a copy of any written confession or admission and a list of the witnesses to its making. If the defendant has made an oral confession or admission a list of the witnesses to its making shall be furnished."

This section by its mandatory language entitles defendant as a matter of right upon motion, to statements he made. It requires no showing of good cause.

Section 95-1801(d)(1), provides:

"Upon motion of either party and upon showing of good cause, the court may issue a subpoena prior to the trial directing any person other than the defendant to produce books, statements, papers and objects before the court at a time prior to the trial or prior to the time when they are to be offered in evidence and the court may, upon their production, permit the books, statements, papers or objects or portions thereof to be inspected, copied, or photographed by the parties and their attorneys."

The Revised Commission Comment discussing this section points out:

"The discovery allowed under subsection (d) is a two-part mechanism for gathering information. Under paragraph (1) either party may require a third person, other than the defendant, through the use of a subpoena (section 93-1501-3), to produce certain articles. The only restriction is that good cause must be shown. This allows what is sometimes referred to as a 'fishing expedition'—but only where third parties are concerned."

Section 95-1801(d)(2), provides:

"Upon motion of the defendant, within a reasonable time before trial, the court may, upon a showing of good cause, at a time and place designated by the court, order the prosecution to produce prior to trial for inspection, photographing or copying by the defendant, designated books, statements, papers, or objects obtained from the defendant or others by the prosecution which are material, relevant and necessary to the preparation of the defendant's case."

The Revised Commission Comment discussing this provision states:

"The second paragraph permits discovery by the defendant or the prosecution with the additional requirement that the object desired must be 'material, relevant and necessary to the preparation of the case.'"

This comment indicates the showing necessary to get access to material in the hands of the prosecutor is greater than that required to get material in the hands of third parties.

■ Against this background, and with the recognition that in most criminal cases in Montana discovery is conducted on a more informal basis without resort to the motion and hearing procedures outlined above, this Court finds the allegation of error based on a delay of approximately one week in complying with the demand made by defendant after trial had begun to be without merit.

■ Defendant claims he had made two prior demands upon the county attorney for this material. These demands were in the

form of letters to the county attorney. Defendant made a number of specific requests and then made a general request for ". . . copies of any documentary or physical items which you will rely on for proof of any fact . . ." The second letter expressed defense counsel's opinion that the State was not going to provide the requested information. This letter was dated August 20, 1974. On January 13, 1975, after trial began, defendant filed a demand and motion requesting that all statements taken by the prosecution from all witnesses be turned over to defendant and demanding immediate compliance. Any delay in the prosecution furnishing defendant with the material requested in his earlier letters was waived by defendant's failure to file a demand and motion for this material until after trial had begun.

Even though the demand and motion was not made "within a reasonable time before trial", as required under section 95-1801(d)(2), the court granted the motion saying:

"Before a witness takes the stand, other than your foundation witnesses, that you [the State] are proceeding with now, furnish them [defense counsel] with such copies as you have that are not your work product as such, and before they [the witness] take the stand, he is going to·be given an opportunity to talk with each witness, particularly those that have been endorsed just the other day . . ." (Bracketed material added.)

The time it took for the State to gather, sort, and copy the requested material during the presentation of the State's case-in-chief was reasonable. The court prevented any prejudice by allowing defendant to interview the witnesses prior to their taking the stand. We note the State complied with the specific requests made by defendant in the August letters, and the reports received from the FBI and the autopsy report were forwarded to defendant soon after they were received and prior to the August requests.

Defendant objects to certain photographs which were introduced into evidence as being gruesome and inflammatory or otherwise prejudicial.

The basic rule on photographic evidence in Montana as stated in

State v. Campbell (1965), 146 Mont. 251, 261, 405 P.2d 978, 984, is:

". . . Photographs are admissible for the purpose of explaining and applying the evidence and assisting the court and jury in understanding the case. *Fulton v. Chouteau County Farmers' Co.*, 98 Mont. 48, 37 P.2d 1025. When the purpose of an exhibit is to inflame the minds of the jury or excite the feelings rather than to enlighten the jury as to any fact, it should be excluded. *State v. Bischert*, 131 Mont. 152, 308 P.2d 969. . . ."

Here, the photographs in question fall into three categories: (1) Photographs of the body taken at the "drill site"; (2) autopsy photographs taken by the pathologist; and (3) a single photograph of a can of spray paint in a suitcase.

In each instance these photographs meet the above test. They were relevant, useful, and necessary in explaining the evidence and assisting the court and jury in understanding the case. The photographs taken at the site where the body was found were used by the pathologist to show creases in the body which were not present after the body had been moved and which tended to show how long the body had been at the site. The autopsy photographs taken in color and then printed in black and white, were used by the pathologist to show the nature of the wounds and explain the evidence which formed the basis of his opinion as to the size and configuration of the weapon which was used to inflict the wounds. The photograph of the can of spray paint in the suitcase was used to show the defendant had in his possession a type of paint which was not available in local stores. Defendant finds prejudice from this photograph in the implication of flight that could arise from the fact the paint was in a suitcase. However, defendant had been in custody for some time prior to the time these photographs were taken. This alleged prejudice could have been easily explained away in cross-examination. There was no intent to excite feelings with this photograph which was in no way gruesome. It was properly admitted.

Defendant also objects that certain expert opinion was

allowed to be given prior to the completion of the chain of possession of the evidence upon which this opinion was based. This opinion evidence was given by FBI agents who were witnesses for the State. The judge allowed them to give their opinion as to the evidence they had examined, which had not as yet been admitted in evidence, because there was a portion of the chain of possession which had not been established. It is within the discretion of the court to allow opinion to be given, conditioned on the subsequent production and admission of the evidence which forms the basis of the opinion. *Risken v. Northern Pac. Ry.* (1960), 137 Mont. 57, 350 P.2d 831; *Graham v. Rolandson* (1967), 150 Mont. 270, 435 P.2d 263. The chain of possession of the evidence was later supplied. Thus no error was committed.

Next defendant complains that a number of his proposed exhibits were refused admission into evidence. Our examination of the record reveals that these exhibits were refused on the basis of a lack of a proper foundation. The rule is that the determination of whether a proper foundation has been laid for the introduction of exhibits into evidence rests with the trial court, and its determination will not be overturned on appeal unless there is a clear abuse of discretion. *State v. Olsen* (1968), 152 Mont. 1, 445 P.2d 926. In this case, we cannot say the trial court abused its discretion in not admitting defendant's exhibits into evidence. Defendant's argument is without merit.

Defendant contends the extensive preliminary instructions given by the court were erroneous, that it was error to give them prior to the introduction of evidence, and that the remaining instructions given after the presentation of evidence were wrong.

The preliminary instructions were the usual instructions given on the role of the jury. In addition, included were a number of instructions which set out the elements of the various crimes of which defendant was accused, and set out statutory definitions of terms used.

Montana's criminal code is written in clear plain language which serves well as the basis for instructions to the jury. There

was no error in incorporating the entire Information into the preliminary instructions, for it too is basically in statutory language merely inserting defendant's name and the victim's name in the proper places and enumerating the weapons used. The language is not inflammatory but is as neutral as language detailing the charges involved here can be. Examination of the instruction defining reasonable doubt and the burden of proof show proper statements of the law.

Defendant asserts that language in the instruction which defines the degree of proof necessary as being that which convinces the mind "to a moral certainty of the truth of the charge, no more and no less" falls into the type of error found in *State v. Taylor* (1973), 163 Mont. 106, 515 P.2d 695. In *Taylor*, the State's burden was defined using the phrase "only such proof as may" which impliedly limits consideration of some of the evidence and which could be interpreted to limit the burden of proof. Here, the nature of the subjective judgment to be made by the jurors is set forth, and the language "no more and no less" merely emphasizes the nature of the judgment and in no way diminishes it.

The Court finds no error to the prejudice of defendant from the fact that extensive preliminary instructions were given prior to the introduction of evidence in the case. Defendant concedes that section 95-1911, R.C.M.1947, gives the court the power to vary the order of trial set out in section 95-1910, R.C.M.1947, for good reasons. The present case was built entirely on circumstantial evidence. Some of the counts charged were complex and difficult to understand. For example, the second homicide count was a felony homicide which had as alternative felonies, sexual intercourse without consent and aggravated assault. The aggravated assault alternative had alternate aggravating factors, serious bodily injury or bodily injury with a weapon, and a listing of alternative weapons, a rope or a heavy object. It was for good reason that the judge instructed the jury as to the basic elements of all the offenses charged, so the jury could have some understanding of the complex circumstantial evidence to be presented. In a less

complex case which was not based only on circumstantial evidence, such preliminary instructions might not be necessary and there would not be the required good reasons for varying the usual order of the trial, but here it was acceptable to do so.

One of the preliminary instructions to which defendant objects is the one defining torture. The instruction states:

"Whoever purposely assaults another physically for the purpose of inflicting cruel suffering upon the person so asssaulted for the particular purpose of enabling the assailant to either:

"(a) extort anything from such person;

"(b) or to persuade such person against his or her will, or

"(c) to satisfy some other untoward propensity of the assailant . .

The term "untoward propensity" is defined in the same instruction as meaning "any perverse, wrong, bad or corrupt inclination or tendency." Defendant maintains that this instruction incorrectly defined torture.

A number of California cases have adopted a similar definition of torture. *People v. Daugherty* (1953), 40 Cal.2d 876, 256 P.2d 911, 917 states:

"Murder is perpetrated by torture 'when "the assailant's intent was to cause cruel suffering on the part of the object of the attack, either for the purpose of revenge, extortion, persuasion, or to satisfy some other untoward propensity." *People v. Tubby*, 34 Cal.2d 72, 77, 207 P.2d 51, 54; *People v. Bender*, 27 Cal.2d 164, 177, 163 P.2d 8.' *People v. Martinez*, 38 Cal.2d 556, 561, 241 P.2d 224, 227."

The language of the instruction proposed by defendant is an exact quotation from the opinion of an earlier California case, *People v. Heslen* (1945), 163 P.2d 21, 27. See: 27 Cal.2d 520, 165 P.2d 250. That case dealt with the sufficiency of the evidence to support a finding of murder by torture and while there is no real conflict between the two instructions, the one given by the court is in the general language which does not comment on the evidence, which breaks the elements down, and which sets the various pur-

poses out in the alternative is a clearer and more understandable statement of the law. The instruction given is a proper one and certainly the better of the two proposed instructions. *People v. Wiley* (1976), 18 Cal.3d 162, 133 Cal.Rptr. 135, 554 P.2d 881.

The District Court gave "additional instructions" (instructions 29 through 53) to the jury at the conclusion of the evidence at the trial. These instructions will be discussed in the light of *Patterson* and *Sandstrom* under the last specification of error herein.

Defendant goes on to claim error because his offered jury instructions were not given. This argument must fail. Defendant's instructions on mental state and mental disease and defect misstate the law, and the instructions on the elements of the crimes charged add an element that is not required.

The next argument defendant raises is that the verdict forms provided to the jury did not cover all possible verdicts and that they amount to special verdicts.

Defendant submitted instructions and verdict forms which covered the offenses of mitigated deliberate homicide and unlawful restraint. It is clear, as stated in *State v. gray* (1968), 152 Mont. 145, 153, 447 P.2d 475, 479:

". . . 'The submission of a lower offense is justified only when the evidence on some basis would support a finding that the defendant is innocent of the higher offense and guilty of the lower.' . . ."

See also: *State v. McDonald* (1915), 51 Mont. 1, 149 P.279; *State v. Baugh* (1977), 174 Mont.456, 571 P.2d 779. In this case there was no such evidence and the instructions and verdict forms on the lesser offenses were properly not given.

Defendant claims error in that the verdict forms submitted to the jury were special verdicts. He argues that Montana law does not allow for specific factual findings by the jury.

The jury was given general verdicts asking for a finding of guilty or not guilty on each count. The jury was to make the additional finding that the element necessary for the imposition of the death penalty was present. Under those circumstances this addi-

tional factual finding does not fall into the vice of a special verdict. It does not require a fact determination which could be used to undermine the general verdict. Thus, the verdict forms were permissible.

Defendant claims prejudicial error in the court's permitting the audience to tape record the State's closing argument to the jury. He contends this prejudiced his right to a fair trial. His argument is that the jury was influenced by the argument being recorded because the jury could believe, under those circumstances there was something worth preserving.

In his brief, defendant admits that the court's failure to prohibit the recording of the argument violates no statute. He cites no case law that is violated. He admits the Canons of Judicial Ethics, which have been adopted by this Court, do not specifically deal with this question. He does say that the Code of Judicial Conduct prohibits such recording. However, that Code has not been adopted in Montana. Thus, no law or rule of this Court was violated by the audience's tape recording the argument.

As to defendant's argument that it prejudiced his right to a fair trial, we find no merit in that claim. The rule is that before a judgment in a criminal case will be reversed, prejudice must be shown. *State v. Totterdell* (1959), 135 Mont. 56, 336 P.2d 696. The defendant must demonstrate prejudice from the record. *State v. Schleining* (1965), 146 Mont. 1, 403 P.2d 625. Defendant has not demonstrated he was prejudiced by the recordings of the closing argument. His right to a fair trial was neither denied nor invaded.

"When the state of the pleading requires it, or in any other case, for good reasons, and in discretion of the court, the order prescribed in the last section may be departed from."

We note that the artful phrase "good cause" is not used, rather there must be "good reasons" for the departure of the usual order of the trial.

Defendant's difficulty arose from the fact the FBI agents who were to testify in this case were scheduled to testify in several other cases in other states and the judge would not require them to

remain for the duration of the trial, nearly three weeks, unless there was good reason to keep them. The court requested defendant make an offer of proof to show why these persons should not be released from their subpoenas after defendant opened his case-in-chief. Defendant argued that no reasonable offer of proof could be made until the completion of the State's case-in-chief. This may well have been true prior to enactment of the liberal discovery procedures in the Code of Criminal Procedure. In the present case, however, defendant had examined the FBI reports; he had examined the physical evidence; and he had a list of the proposed exhibits that were to be put into evidence. If there was some reason to require the FBI agents to remain, defendant would know it at the time of trial. No showing of such need was made and the judge in a proper exercise of his discretion and for good reasons allowed the agents to leave after they had testified as part of the defendant's case-in-chief, in the middle of the State's case-in-chief.

Defendant further alleges error because his expert on mental defect or disease was not allowed to be present during the State's presentation of its rebuttal experts on this matter. Earlier in the trial, defendant sought a ruling from the court that all witnesses be excluded from the courtroom when other witnesses were testifying. The court granted this motion except the court said that the exclusionary rule did not extend to rebuttal witnesses. Defendant's expert was a witness in his case-in-chief. After defendant rested, he sought permission from the court to have this expert present in the courtroom during the testimony of the State's rebuttal experts. The court refused to grant such permission. Defendant alleges this was an abuse of discretion which prejudiced defendant.

We are unconvinced the court abused its discretion. Defendant's expert was a witness in his case to whom the exclusionary rule applied. The fact that defendant wanted to use him as a rebuttal witness did not except him from the exclusionary rule defendant had asked the court to invoke. Nor do we see that defendant was prejudiced by the court's action. The State's rebuttal experts' testimony concerned the report they had made on defendant's mental disease

or defect. These were reports that the defense had been supplied with, as required by section 95-505(5), R.C.M.1947. The State's witnesses finished at the end of the day, and defendant's rebuttal began the next day. There was time then to inform the defense expert of any additional information not in the report made by these experts, and to prepare rebuttal testimony. Under those circumstances, defendant was not prejudiced.

Defendant argues the evidence is insufficient to justify the verdicts rendered against him. He specifically argues that the evidence is insufficient to support the verdicts that defendant committed deliberate homicide by torture and that as a result of her aggravated kidnapping, Lana Harding died. This borders on the frivolous.

In *State.v. Fitzpatrick* (1973), 163 Mont. 220, 226, 516 P.2d 605, 609, this Court set forth its position in determining questions of sufficiency of the evidence:

"As this Court has held many times over, the jury is the fact finding body in our system of jurisprudence, and its decision is controlling. The jury is free to consider all the evidence presented and to pick and choose which of the witnesses it wishes to believe. If sufficient testimony was introduced, as well as exhibits to justify the jury's findings, then its conclusion will not be disturbed unless it is apparent there was a clear misunderstanding by the jury or that there was a misrepresentation made to the jury."

In this case, the evidence presented to the jury did not mislead them, nor was any of it ever misrepresented to them. The evidence was sufficient to justify the jury's finding that Lana Harding was killed by means of torture and that she died as a result of her aggravated kidnapping by defendant.

The rule is that if substantial evidence is found to support the verdict, it will stand. *State v. White* (1965), 146 Mont. 226, 405 P.2d 761; *State v. Stoddard* (1966), 147 Mont. 402, 412 P.2d 827. Such is the case here.

Defendant alleges error in the trial court's denial of his motion for a new trial. He contends he was entitled to a new trial due to in-

sufficiency of the evidence. He further argues that the cumulation of errors committed in his trial denied him a fair trial.

As the evidence was sufficient to sustain defendant's conviction, the court did not err in denying the motion for new trial.

We find no merit in defendant's argument on cumulative error. Since we have held that no substantial errors were committed, we fail to see how the doctrine of cumulative error applies. We are unconvinced that the concepts of "harmless error" and "cumulative error" are interrelated. "Harmless error" refers to technical errors, which do not require reversal. *State v. Gallagher* (1968), 151 Mont. 501, 445 P.2d 45. "Cumulative error" refers to a number of errors which prejudice defendant's right to a fair trial. *State v. Meidinger* (1972), 160 Mont. 310, 502 P.2d 58. Having found that no substantial errors were committed by the trial court, we hold that the doctrine of cumulative error does not apply and a new trial will not be ordered.

Defendant asserts that the trial court erred by basing its judgment and sentence upon erroneous findings, conclusions, sentence and order. He further argues the death penalty imposed as a sentence by the trial court is unconstitutional under the United States Constitution and the 1972 Montana Constitution.

As to the errors in the court's findings, conclusion, sentence and order, the errors referred to are essentially clerical errors in the body of that document. A mistaken citation of subsection letter in section 94-5-105, R.C.M.1947, which was caused by the amendment which numbered the section, is an example. This document is not in error with respect to the factual or legal basis of its findings. This Court finds no prejudice in the clerical errors.

Defendant was sentenced to death for his conviction of the offenses of deliberate homicide by reasons of torture and aggravated kidnapping. This sentence was imposed by virtue of sections 94-5-105 and 94-5-304, R.C.M.1947. At the time of the crimes, these statutes read:

"94-5-105. Sentence of death for deliberate homicide.

"(1) When a defendant is convicted of the offense of deliberate

215

homicide the court shall impose a sentence of death in the following circumstances, unless there are mitigating circumstances:

"(a) The deliberate homicide was committed by a person serving a sentence of imprisonment in the state prison; or

"b) The defendant was previously convicted of another deliberate homicide; or

"(c) The victim of the deliberate homicide was a peace officer killed while performing his duty; or

"(d) The deliberate homicide was committed by means of torture; or

"(e) The deliberate homicide was committed by a person lying in wait or ambush; or

"(f) The deliberate homicide was committed as a part of a scheme or operation which, if completed, would result in the death of more than one person."

"94-5-304. Sentence of death for aggravated kidnapping.

"A Court shall impose the sentence of death following conviction of aggravated kidnapping if it finds that the victim is dead as the result of the criminal conduct unless there are mitigating circumstances."

These sections were enacted in 1973, and became effective on January 1, 1974. In 1974, section 94-5-304 was amended by Ch. 126, § 1, Laws of 1974, to read:

"94-5-304. Sentence of death for aggravated kidnapping. A court shall impose the sentence of death following conviction of aggravated kidnapping if it finds that the victim is dead as the result of the criminal conduct."

This amendment deleted the phrase: "unless there are mitigating circumstances." The amendment had an effective date of March 11, 1974. At the time of the death of Lana Harding, this amendment was not in effect. Therefore, our analysis of the constitutionality of these death penalty statutes will concern them as they existed at the time of the crimes involved in this case.

The death penalty statutes in question here were adopted in

response to *Furman v. Georgia* (1972), 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346. In *Furman*, the Supreme Court reversed and vacated death sentences imposed on three defendants. It was a per curiam opinion, with five separate concurrences and four separate dissents. The five concurring opinions each asserted different theories for finding the statutes in question unconstitutional. Essentially, the fatal flaw in the death penalty, under the concurring opinions of *Furman*, was the absence of consistent application of the sanction.

The cumulation of majority opinions in *Furman* led to considerable confusion among the several states' legislatures which desired to retain a constitutionally viable death penalty, i. e., death penalty that was being imposed consistently and not arbitrarily. In some jurisdictions *Furman* was read as requiring a strictly mandatory death sentence for certain classes of proven crimes. In other jurisdictions, *Furman* was read as attacking unbridled discretion rather than discretion per se. These states passed statutes to control the discretion of the sentencing authority. These statutes allowed the death penalty to be imposed only when unmitigated aggravating circumstances were present.

In 1976, the United States Supreme Court considered the constitutionality of mandatory death penalty statutes. *Woodson v. North Carolina* (1976), 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944. The statute before the Court was North Carolina's death penalty statute. It provided a death sentence for all persons convicted of first degree murder. The Supreme Court held the statute unconstitutional as violative of the Eighth and Fourteenth Amendments. In two later cases, the Supreme Court also held mandatory death penalty statutes unconstitutional. *Coker v. Georgia* (1977), 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982; *Harry Roberts v. Louisiana* (1977), 431 U.S. 633, 97 S.Ct. 1993, 52 L.Ed.2d 637. The problem with mandatory death penalty statutes, according to the Court, was:

". . . it is essential that the capital sentencing-decision allow for consideration of whatever mitigating circumstances may be rele-

vant to either the particular offender or particular offense . ." *Harry Roberts*, 431 U.S. 637, 97 S.Ct. 1995.

The death penalty statutes under attack in the instant case, sections 94-5-105 and 94-5-304, as they existed at the time of the crimes, are not mandatory death penalty statutes. Thus, they can withstand scrutiny under the decisions of *Woodson*, *Coker*, and *Harry Roberts* because they allow for consideration of mitigating circumstances.

Also in 1976, the Supreme Court considered the constitutionality of those death penalty statutes that controlled the discretion of the sentencing authority. Unlike their mandatory counterparts, the Court upheld these statutes. *Gregg v. Georgia* (1976), 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859; *Proffitt v. Florida* (1976), 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913; and, *Jurek v. Texas* (1976), 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929. In *Gregg* the Supreme Court stated:

"*Furman* mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." 428 U.S. 189, 96 S.Ct. 2932.

The Montana statutes defendant challenges are designed to control the discretion of the sentencing authority. These statutes are in the constitutionally permissible ground between unbending mandatory death sentences and unbridled discretion in the imposition of the death penalty.

■ In its decision of *Gregg*, *Jurek*, and *Proffitt*, the United States Supreme Court seems to have established three general criteria which are requisite to a valid death penalty statutory scheme.

First, there must be at least one statutory aggravating circumstance before a death sentence may be considered. Second, the defense must be afforded the opportunity to bring before the sentencing body at a separate sentencing hearing any mitigating circumstances relating to the individual defendant. Third, there

must be available prompt judicial review of the sentencing decision by a court of state-wide jurisdiction, providing a means to promote the evenhanded, rational and consistent imposition of death sentences under the law.

Sections 94-5-105 and 94-5-304 satisfy the first criterion set forth above. Under section 94-5-105, the death penalty cannot be imposed unless one of six aggravating circumstances is found by the trier of fact to exist. Here, it was found that defendant committed deliberate homicide by means of torture. Section 94-5-105(1)(d), R.C.M.1947. Under 94-5-304, the death sentence cannot be imposed unless it is found the kidnap victim died as a result of the aggravated kidnapping. Such a finding was made in this case by the jury.

The second criterion, that mitigating circumstances be reviewed at a separate sentencing hearing, is satisfied by two separate statutory provisions: First, both death penalty statutes provide that the court "shall" impose a sentence of death "unless there are mitigating circumstances". Defendant urges the "unless" clause may purport to circumscribe the sentencing judge's authority, but there are no guiding standards nor sources of information provided for. This argument ignores the second statutory provision relevant here — that is, the presentence investigation report to be delivered to and considered by the sentencing court in felony cases. Section 95-2204, R.C.M.1947, provides the report shall contain information respecting "the characteristics, circumstances, needs, and potentialities of the defendant; his criminal record and social history; the circumstances of the offense; . . . and the harm to the victim, his immediate family, and the community." The report provides the sentencing authority with whatever circumstances may exist in mitigation of the defendant's conduct.

Reading the two provisions together, the sentencing court is required to consider mitigating circumstances and is required to consider the presentence investigation report which must contain any matters relevant to mitigation. In addition, all sentencing courts are directed by section 95-2201, R.C.M.1947, to perform their

sentencing functions "to the end that persons convicted of a crime shall be dealt with in accordance with their individual characteristics, circumstances, needs and potentialities." This mandates the imposition of sentences which are not disproportionate to the severity of the crime. Finally, the defendant is authorized to seek a hearing to present to the court his testimony and evidence in mitigation of punishment.

Prompt judicial review of death sentences is provided for by appeal to this Court as well as review to the Sentence Review Division. This Court determines the legality of the sentence imposed, *State v. Simtob* (1969), 154 Mont. 286, 462 P.2d 873, while the Sentence Review Division is designed to determine the appropriateness of the sentence with respect to the individual offender and particular offense. This satisfies the third criteria.

Although Montana's statutory scheme is unlike those approved by the United States Supreme Court in *Gregg, Proffitt,* and *Jurek,* we see no substantive failure of Montana's statutory scheme to comply with constitutional standards. Our system is neither wholly mandatory nor wholly discretionary. There are precise statutory requirements for finding aggravating and mitigating circumstances, and a procedure for flushing out the facts with respect to such circumstances. There is appellate review at two levels, insuring that the sentence is both legal and proportional to the nature and class of crime. In short, we believe that the Montana statutory scheme in existence at the time of the crimes herein, affords defendant the procedural safeguards necessary to protect his substantive rights to be sentenced without arbitrariness or caprice. *State v. Coleman* (1979), 185 Mont. 299, 605 P.2d 1000 (decided June 20, 1979).

Therefore, we hold that the death penalty statutes in question in this case are constitutional under the United States constitutional requirements. They are constitutional on their face and as applied to this defendant.

Defendant next contends that shifting the burden of proving in-

sanity to the defendant offends the due process clause of the Montana Constitution.

Defendant relies on the reasoning of a Colorado case, *State ex rel. Juhan v. District Court* (1968), 165 Colo. 253, 439 P.2d 741. Prior to *Juhan*, the Colorado Supreme Court had always held the burden was on the state to disprove a properly raised defense of insanity beyond a reasonable doubt. The legislature subsequently passed a statute purporting to shift the burden to defendant. The Colorado Supreme Court in *Juhan*, in a 3-2 decision, held its previous decisions were interpretations of the due process clause of the Colorado Constitution, and therefore the legislature was powerless to vary the constitutional ruling by legislative enactment.

Defendant's reasoning is similar. In 1895, the United States Supreme Court held that in the federal system, the burden was on the state to disprove insanity beyond a reasonable doubt. *Davis v. United States* (1895), 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499. Three Montana cases decided shortly thereafter adopted the *Davis* rule for Montana. *State v. Brooks* (1899), 23 Mont. 146, 57 P. 1038; *State v. Peel* (1899), 23 Mont. 358, 59 P. 169; *State v. Felker* (1903), 27 Mont. 451, 71 P. 668. The Montana Legislature in 1925 passed Ch. 87, Laws of 1925, imposing the burden on defendant to prove his insanity by a preponderance of the evidence. This became subsection 2 of former section 94-119, R.C.M.1947. The present statute, passed in 1967, is section 95-503, R.C.M.1947. Thus, the burden has remained on the defendant since 1925. Montana cases since 1925 have relied upon the statute and held the jury should be instructed that defendant must prove insanity by a preponderance of the evidence. *State v. Vettere* (1926), 76 Mont. 574, 248 P. 179. The main thrust of defendant's argument is that the old Montana cases were of constitutional significance and could not be varied by the legislature; thus Montana's statutes have violated the due process clause of the Montana Constitution since 1925.

The problem with this argument is that it assumes *Brooks*, *Peel*, and *Felker* were based on the due process clause of the Montana

Constitution. There is no mention of the Montana Constitution in any of them. They merely followed the rule announced by the Supreme Court in *Davis*. The Supreme Court in *Leland v. Oregon* (1952), 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302, noted that *Davis* "obviously establishes no constitutional doctrine, but only the rule to be followed in federal courts." Similarly, it is apparent that *Brooks*, *Peel* and *Felker* were not establishing a constitutional doctrine for Montana. Just as Congress could conceivably change the federal rule set forth in *Davis*, the Montana Legislature clearly had the power to change the rule announced in the early Montana cases.

On remand from the United States Supreme Court, the issue before this Court is whether the trial court's instruction on mental disease or defect unconstitutionally shifted the burden of proof of state of mind to defendant. The Supreme Court directed us to reconsider our early decision in this case in light of *Patterson v. New York* (1977), 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281. In doing so,, we will examine the defense of mental disease or defect as it exists under Montana law and as applied in this case.

Evidence of a defendant's mental disease or defect is admissible in Montana criminal trials for two statutory defenses. Section 95-501(a), R.C.M.1947, provides:

"A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he is unable either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law."

This section defines Montana's "legal insanity" defense. Section 95-503(a), R.C.M.1947, places upon the defendant the burden of establishing his legal insanity by a preponderance ot the evidence. Defendant concedes the State may allocate to the defendant the burden of proving his legal insanity without violating the United States Constitution. *Patterson v. New York*, supra; *Rivera v. Deleware* (1976), 429 U.S. 877, 97 S.Ct. 226, 50 L.Ed.2d 160; *Leland v. Oregon*, supra. Defendant contends, however, that the second criminal defense involving mental disease or defect unconstitu-

tionally shifted the burden to defendant to disprove intent, an essential element of the crime charged.

In addition to the legal insanity defense which, if proven, excludes a defendant's responsibility for an otherwise criminal act, evidence of a defendant's mental disease or defect is also admissible in Montana criminal trials " . . . whenever it is relevant to prove that the defendant did or did not have a state of mind which is an element of the offense." Section 95-502, R.C.M.1947. This section is a codification of the "diminished capacity" defense, under which a defendant may show that he suffered from a mental disease or defect which, although insufficient to establish legal insanity as a complete defense, made him incapable of forming the criminal intent defined by statute as an element of the crime charged.

In 1967, when section 95-502, R.C.M.1947, was enacted by the Montana legislature, homicide in Montana was divided into four classifications, each requiring a different and specific mental state. The intent element of first degree murder was deliberation, premeditation and malice aforethought, while that of second degree murder was malice aforethought, without deliberation or premeditation. Section 94-2503, R.C.M.1947. *State v. Brooks* (1967), 150 Mont. 399, 436 P.2d 91. Voluntary manslaughter consisted of any unlawful killing, without malice, upon a sudden quarrel or heat of passion. Section 94-2507(1), R.C.M.1947. Involuntary manslaughter, the fourth classification of homicide under Montana criminal law in 1967, did not have criminal intent as a statutory element of the crime; the issue, rather, was one of criminal negligence. Section 94-2507(2), R.C.M.1947. *State v. Souhrada* (1949), 122 Mont. 377, 204 P.2d 792.

The diminished capacity defense was traditionally used to show that, due to mental disease or defect, the defendant was unable to form the specific intent which was an element of a higher degree of an offense such as homicide, and that a lesser degree of criminal homicide, which lacked that specific intent as an element of the crime, was in fact committed. See, Anno. 22 A.L.R.3d 1228,

1238-43 (1968). Thus, under Montana law in effect when section 95-502, R.C.M.1947, was enacted, evidence of a defendant's mental disease or defect was admissible to prove or disprove, for example, that, although a defendant committed an unlawful killing with malice aforethought, he had not the capacity to form the specific intent—deliberation or premeditation—which was an element of first degree murder.

By January 1974, when Lana Harding was kidnapped and murdered, Montana had adopted its present criminal code. The new code abolished all distinctions between first and second degree murder. Malice aforethought and premeditation are no longer elements of the criminal homicide offense. The intent element of the crime of homicide under present Montana law is merely "purposely, knowingly, or negligently" causing the death of another human being. Section 94-5-101, R.C.M.1947. There are three types of criminal homicide. Defendant was charged with, and convicted of, deliberate homicide, a criminal homicide committed purposely or knowingly. Section 94-5-102(1)(a), R.C.M.1947. Mitigated deliberate homicide, a lesser offense, also requires that the defendant commit the criminal homicide purposely or knowingly, but that the deliberate homicide be committed under the influence of extreme mental or emotional stress for which there is a reasonable excuse. Section 94-5-103(1), R.C.M.1947. The third type of criminal homicide, negligent homicide, is inapplicable to the facts shown at trial.

Because the statutory definitions of both deliberate homicide and mitigated deliberate homicide require proof by the State of the identical mental element—purposely or knowingly—there was no lesser degree of criminal homicide of which defendant could have been convicted upon proof that he was unable to form the mental state required in deliberate homicide. The State concludes that, because of all the charges required a showing of purposeful or knowing conduct, the section 95-502 defense of mental disease or defect negating the ability to form a purposeful or knowing intent was a complete, rather than a partial, defense and as such merged with the insanity defense of section 95-501.

■ We do not agree with the State that, in this case, the diminished capacity and insanity defenses were necessarily identical. The prescribed mental state of "purposely or knowingly" applies to each element of the crime of deliberate homicide. Section 94-2-103(1) and (2), R.C.M.1947. To be guilty of deliberate homicide, therefore, one must either have the purpose to kill or know that it was highly probable that his actions would result in the death of another human being. While legal insanity would have completely exonerated defendant from responsibility for his criminal conduct, the diminished capacity defense could be used in a criminal homicide case to show, for example ". . . that although defendant knew the nature and quality of the act (the assault . . .) and knew that it was wrong" and so was not irresponsible under the legal insanity test, "he lacked mental capacity to form the intent to kill . . .". Weihofen and Overholser, Mental Disorder Affecting the Degree of a Crime, 56 Yale L.J. 959, 979-80 (1948). A defendant then, due to mental disease or defect precluding him from forming the intent to commit criminal homicide, might be found guilty of the lesser included offense of aggravated assault. See, *State v. Booth* (1977), 30 Or.App. 351, 567 P.2d 559, 561-62.

Defendant maintains the State was required to prove ". . . that defendant had, and could have had, a particular state of mind which is an element of the offense," and that by making diminished capacity an affirmative defense, the trial judge unconstitutionally shifted to defendant the burden of disproving an essential element of the offenses charged.

". . . the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship* (1970), 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368.

We must therefore analyze Montana's deliberate homicide statute to determine if a defendant's lack of mental disease or defect, and his resulting ability to purposely or knowingly cause the death of another person, is a fact necessary to constitute the crime charged. *Patterson v. New York*, supra.

In Montana, a person commits the offense of deliberate homicide if he purposely or knowingly causes the death of another human being. Sections 94-5-102(1)(a), 94-5-101(1), R.C.M.1947. The statutorily defined elements of the offense, each of which the State must prove beyond a reasonable doubt, are therefore causing the death of another human being with the knowledge that you are causing or with the purpose to cause the death of that human being. A person acts "with knowledge" or "knowingly" ". . . with respect to the result of conduct described by a statute defining an offense when he is aware that it is highly probable that such result will be caused by his conduct . . ." Section 94-2-101(27), R.C.M.1947. The statute does not require the State to prove the defendant does not suffer from mental disease or defect which would prevent the defendant from doing the act purposely or knowingly.

Because sanity or lack of mental disease or defect is not an element included in the definitions of any of the crimes charged against defendant, the State may rely upon the rebuttable presumption that the defendant was sane when the offense was committed. Cf. *Mullaney v. Wilbur* (1975), 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508; see, *Patterson v. New York*, 432 U.S. 212-216, 97 S.Ct. 2330. The sanity presumption is a presumption which all the states employ in criminal trials. See, H. Weihofen, *Mental Disorder as a Criminal Defense* (1954), pp. 214-215, and cases collected therein; *Leland v. Oregon*, 343 U.S. at 799, 72 S.Ct. at 1007. Without a presumption that everyone is sane and capable of committing crimes, ". . . the government would always be under the necessity of adducing affirmative evidence of the sanity of an accused. But a requirement of that character would seriously delay and embarrass the enforcement of the laws against crime, and in most cases be unnecessary . . ." *Davis v. United States* (1895), 160 U.S. 469, 486, 16 S.Ct. 353, 357, 40 L.Ed. 499. The trial court instructed the jury defendant was presumed to have been sane at the time the offenses were committed. Defendant himself in his requested instructions stated that "Every man is presumed to be sane,

that is, to be without mental disease or defect . . ." The presumption of sanity did not shift to defendant the burden of disproving a fact necessary to constitute the crime charged.

". . . To recognize at all a mitigating circumstance does not require the State to prove its nonexistence in each case in which the fact is put in issue . . ". . . Proof of the nonexistence of all affirmative defenses has never been constitutionally required . . ." *Patterson v. New York*, 432 U.S. 209, 210, 97 S.Ct. 2326, 2327.

The section 95-502, diminished capacity defense, is an affirmative defense. Section 94-2-103(6), R.C.M.1947. To rebut the presumptions of sanity and capability of forming a purposeful and knowing intent, a defendant may admit evidence relevant to ". . . prove that he did not have a particular state of mind which is an essential element of the offense charged." Section 95-503(b)(2), R.C.M.1947. These sections do not define the standard of proof necessary to establish this affirmative defense, and neither section 95-502 nor section 95-503(b)(2) has been interpreted by this Court. We hold that, to prove a section 95-502 defense, a defendant must prove by a preponderance of the evidence that he lacked the ability, due to mental disease or defect, to form that criminal mental state which is defined by statute as an element of the crime with which he is charged.

Placing on a defendant the burden of proving the diminished capacity defense does not offend ". . . 'some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.' . . ." *Speiser v. Randall* (1958), 357 U.S. 513, 523, 78 S.Ct. 1332, 1341, 2 L.Ed.2d 1460. Several jurisdictions do not even allow diminished capacity as an affirmative defense. See, *State v. Doss* (1977), 116 Ariz. 156, 568 P.2d 1054; *Bethea v. United States* (D.C.App.1976), 365 A.2d 64; cases collected in 22 A.L.R.3d 1228, 1235-1238. Indeed, in an opinion in which the Supreme Court considered whether a trial court must instruct jurors that they should consider evidence of diminished capacity, the Court held that this was a matter of peculiarly local concern entrusted to the local courts.

". . . For this Court to force the District of Columbia to adopt such a [diminished capacity] requirement for criminal trials would involve a fundamental change in the common law theory of responsibility." *Fisher v. United States* (1946), 328 U.S. 463, 476, 66 S.Ct. 1318, 1324-1325, 90 L.Ed. 1382. (Bracketed material added.)

Because psychiatric evaluation as to subtle gradations of mental impairment is highly subjective and not within the common experience of the layman juror, the State may in fairness require a defendant to convince the jury of his diminished capacity by a preponderance of the evidence.

The fact that psychiatry is a developing and, at present, inexact science has long been noted by the courts. See *Greenwood v. United States* (1956), 350 U.S. 366, 76 S.Ct. 410, 100 L.Ed. 412; *Warhlich v. Arizona* (9th Cir. 1973), 479 F.2d 1137; *Bethea v. United States*, supra.

"The science of psychiatry is at most an educated guess as to the certainty of human behavior, which cannot be predicted with any absoluteness . . ." *People v. Del Guidice* (1973), 74 Misc.2d 293, 345 N.Y.S.2d 341, 344.

In rejecting the diminished capacity defense, courts have also compared diminished capacity with other defenses and noted:

". . . [u]nlike the notion of partial or relative insanity, conditions such as intoxication, medication, epilepsy, infancy, or senility are, in varying degrees, susceptible to quantification or objective demonstration, and to lay understanding . . ." *Bethea v. United States*, 365 A.2d 64, 88. See, *Wahlrich v. Arizona*, supra; *State v. Doss*, supra.

The myriad problems with allowing the introduction of psychiatric testimony to determine criminal responsibility are discussed in Ennis & Litwack, *Psychiatry and the Presumption of Expertise: Flipping Coins in the Courtroom*, 62 Cal.L.Rev. 693, 737 (1974).

Despite the potential problems of proof in allowing the diminished capacity affirmative defense, and despite the fact that a state very likely is not constitutionally required to even allow dimin-

ished capacity as an affirmative defense, Montana does allow the defense. While the Montana legislature was willing to recognize diminished capacity:

". . . as an exculpatory . . . circumstance affecting the degree of culpability . . . it was willing to do so only if the facts making out the defense were established by the defendant with sufficient certainty. The State was itself unwilling to undertake to establish the absence of those facts beyond a reasonable doubt, perhaps fearing that proof would be too difficult and that too many persons deserving treatment as murderers would escape that punishment if the evidence need merely raise a reasonable doubt about the defendant's [diminished capacity]. . ." *Patterson v. New York*, 432 U.S. 207, 97 S.Ct. 2325.

In this case, the State meticulously proved the facts constituting the deliberate homicide and aggravated kidnapping crimes beyond any reasonable doubt, based on all the evidence including the evidence of defendant's alleged mental disease or defect. The State, consistent with the *Leland* and *Rivera* cases, could then constitutionally refuse to sustain the affirmative defense of diminished capacity unless defendant proved that defense by a preponderance of the evidence.

The instructions given by the court clearly required the State to prove every element of the offenses charged beyond a reasonable doubt and more than gave defendant the benefit of Montana law on the diminished capacity defense burden of proof. In Instruction 53 the jurors were told that, before considering the diminished capacity defense, they were to ". . . first determine from the evidence in the case beyond a reasonable doubt whether the defendant did do the acts charged against him in the Information." The court separately instructed the jury that to find defendant guilty of any of the offenses charged, they must first find that defendant ". . . committed the act or acts charged voluntarily, while having with regard to each element contained in the law defining the offense one of the mental states contained in the said definition." (Instruction 29.) The court instructed the jury that only if it found

beyond a reasonable doubt that defendant did any of the acts charged against him in the Information should they then consider "whether or not he could have had the requisite mental state for the act or acts which you have found he committed." (Instruction 53.)

Although the court in Instruction 53 instructed the jury as to defendant's burden of proof for his legal insanity defense, nowhere in the instruction itself did the court specifically instruct the jury as to what burden of proof defendant had to satisfy to establish that he could not form a mental state of "purposely" or "knowingly" due to mental disease or defect (the diminished capacity defense). It is well established, however, that ". . . a single instruction to a jury [is not viewed] in artificial isolation, but must be viewed in the context of the overall charge." *Cupp v. Naughten* (1973), 414 U.S. 141, 146-47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368. If all the instructions considered as a whole fairly and accurately present the case to the jury, the fact that one instruction, standing alone, is not as full as it might have been is not reversible error. *State v. Brooks* (1967), 150 Mont. 399, 436 P.2d 91. Instruction 1 in this case made the jury aware of this rule of law. ". . . you are to consider all of the instructions as a whole, and are to regard each in the light of all the others."

The instructions in this case, when considered as a whole, imposed a more lenient burden of proof on defendant than Montana law provided, because the instructions impressed upon the jury that defendant had successfully established his diminished capacity defense if, after considering all the evidence in the case, the jurors entertained a *reasonable doubt* as to whether defendant suffered from mental disease or defect which prevented him from forming a purposeful or knowing state of mind with respect to the offenses charged.

"A person to be guilty of any of the offenses charged in any of the seven counts charged in the Information must have committed the act or acts charged voluntarily, while having with regard to each

element contained in the law defining the offense one of the mental states contained in said definition." (Instruction 29).

". . . In order to convict the defendant of the offense charged in any of said counts all of the material allegations contained in that particular count must be proved beyond a reasonable doubt . . ." (Instruction 6).

"Reasonable doubt is . . . that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction to a moral certainty of the truth of the charge." (Instruction 7).

The instructions which were given to the jury in this case not only protected defendant within the ambit of Montana law, but indeed posited a more liberal burden of proof than that to which defendant was entitled. The instructions, when read together, also required defendant to establish his diminished capacity merely by raising a reasonable doubt, rather than by proof by a preponderance of the evidence.

We now review defendant's conviction in the light of the decision of the United States Supreme Court in *Sandstrom v. Montana* (1979), 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39. The jury instruction in that case was a naked instruction: "[T]he law presumes that a person intends the ordinary consequences of his voluntary acts." This instruction was held unconstitutional under the Fourteenth Amendment to the United States Constitution because the jury might have interpreted it in one of two ways: (1) as a conclusive presumption, or (2) as shifting the burden of persuasion to the defendant to disprove an element of the crime, viz. that defendant "knowingly or purposely" killed the victim. As either interpretation would have rendered the instruction unconstitutional, defendant's conviction was reversed.

The threshold inquiry in ascertaining the constitutional analysis applicable to this kind of jury instruction is to determine the nature of the presumption. *Sandstrom*, supra. *Ulster County Court v. Allen* (1979), 442 U.S. 140, 99 S.Ct. 2213, 60 L.Ed.2d 777. That

determination requires careful attention to the words actually spoken to the jury, for whether a defendant has been accorded his constitutional rights depends upon the way in which a reasonable juror could have interpreted the instruction. *Sandstrom*, supra.

In this case a reasonable juror could not have interpreted the instructions on intent as conclusive presumptions condemned in *Sandstrom*. The jury was told in instruction 31 that "a presumption is a deduction or reasoning which the law expressly directs a jury make from proved fact or facts"; that "presumptions expressly direct you to reason from proved facts"; and that "the law expressly directs the jury to reason: that an unlawful act was done with an unlawful intent and also that a person is presumed to intend the ordinary consequences of his voluntary act." This instruction concludes "Further, unless you are otherwise instructed with regard to a particular presumption, all presumptions are rebuttable; that is, they may be controverted and overcome by other evidence."

In Instruction 33 describing the methods of proof applicable to the offenses of deliberate homicide, the jury was told that the mental state accompanying the voluntary act for the offense of deliberate homicide may be proved by either inferences or presumptions or a combination of the two; that "if you find beyond a reasonable doubt that the defendant, on or about January 21, 1974, in Pondera County, Montana, voluntarily committed an illegal act on Lana Harding, such as assaulting or injuring her, the law presumes that an unlawful act was done with an unlawful intent; that is, the law expressly directs you to reason from such unlawful act that the defendant acted with an unlawful intent, or purpose"; and that "this is a rebuttable presumption, which means it may be controverted and overcome by other evidence, but whether or not a presumption, once it has come into effect is overcome, is for the jury to determine"; and a similar instruction that "the law presumes that a person intends the ordinary consequences of his voluntary act" and that this is a rebuttable presumption.

Instruction 34 described to the jury the methods of proof applicable to deliberate homicide by means of torture. This was one of

the two crimes of which defendant was convicted. The jury was instructed that "the mental state of purposely assaulting another physically to inflict cruel suffering upon that person for a particular purpose cannot be proved by using the legal presumptions you have been directed to use in the proof of deliberate homicide, and must be proved by the use of inference alone."

Similar instructions were given the jury in regard to kidnapping and aggravated kidnapping, viz. that the intent or mental state required to constitute the offense of kidnapping could be proved by a rebuttable presumption, but that the specific intent required to constitute aggravated kidnapping could not be proved by a presumption but must be proved by inference alone.

 We conclude from the foregoing that the instructions considered as a whole do not constitute conclusive presumptions that "the law presumes that a person intends the ordinary consequences of his voluntary acts" or that "an unlawful act was done with an unlawful intent" and that a reasonable juror could not so have interpreted them. Thus the first of the *Sandstrom* condemnations is inapplicable to this case.

The jury was confronted with rebuttable presumptions that a person intends the ordinary consequences of his voluntary acts and that an unlawful act was done with an unlawful intent. A similar rebuttable presumption was found unconstitutional in *Mullaney v. Wilbur* (1975), 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508. The basis of that decision was that such presumption shifted the burden from the State to prove each element of the crime onto the defendant.

 Thus we are squarely faced with determining whether this federal constitutional error constitutes harmless or prejudicial error. The test of harmless constitional error is whether the court can declare its belief that the error was harmless beyond a reasonable doubt. *Chapman v. California* (1967), 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705. *Chapman* rejected a rule that all federal constitutional errors, regardless of the facts and circumstances, were harmful and required automatic reversal of a conviction.

As far as we can determine, the United States Supreme Court has not yet fashioned a uniform standard for determining harmless federal constitutional error beyond *Chapman*. See *Harmless Error: the Need for a Uniform Standard*, St. John's Law Review, Vol. 53, Spring 1979, Number 3, page 541; Assessing the Harmlessness of Federal Constitutional Error — A Process in Need of a Rationale, University of Pennsylvania Law Review, December 1976, Vol. 125, No. 2, page 15. At least three definable approaches appear in United States Supreme Court cases: (1) Focusing on the erroneously admitted evidence or other constitutional error to determine whether it might have contributed to the conviction e.g., *Fahy v. Connecticut* (1963), 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171; (2) excluding the constitutional infirmity where overwhelming evidence supports the conviction e. g., *Milton v. Wainwright* (1972), 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1; (3) determining whether the tainted evidence is merely cumulative or duplicates properly admitted evidence e. g., *Harrington v. California* (1969), 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284.

Under such circumstances, we feel free to adopt any of the three standards in assessing federal constitutional harmless error within the confines of *Chapman*. It seems to us that the overwhelming weight of the evidence standard addresses the realities of jury trial to a greater degree than the others in the context of the *McKenzie* case despite criticism of this standard by text writers and legal commentators. It has been observed by at least one commentator that on the whole, the cases support the propriety of an overwhelming weight of the evidence test. Martha Field, University of Pennsylvania Law Review, Vol. 125, No. 1, p. 21.

We choose to follow this standard in determining federal constitutional harmless error under *Chapman* because it seems to us that an appellate court should view the case as a whole in assessing harmless or prejudicial error and not confine itself to a review of only one component of the case in artificial isolation, in this case the jury instructions. To confine our review solely to the latter would, in our view, require us to take a lopsided view of the case on

appeal and require us to overemphasize jury instructions in relation to the evidence notwithstanding the dictum in *Ulster County Court v. Allen* (1979), 442 U.S. 140, 99 S.Ct. 2213, 60 L.Ed.2d 777.

We find nothing in *Sandstrom* inconsistent with adopting this approach to determining harmless error. In *Sandstrom* the United States Supreme Court expressly declined to reach the issue of harmless error as an initial matter as the Montana Supreme Court had not ruled on this issue. On remand, we granted a new trial to Sandstrom on grounds unrelated to the overwhelming evidence standard in assessing harmless error.

We have also reviewed *Bollenback v. United States* (1946), 326 U.S. 607, 66 S.Ct. 402, 90 L.Ed. 350, and *Brotherhood of Carpenters v. United States* (1947), 330 U.S. 395, 67 S.Ct. 775, 91 L.Ed. 973. These cases indicate that where there is a jury instruction containing an unconstitutional presumption there can be no harmless error and automatic reversal is required. In our view the effect of this holding is ameliorated if not eliminated by the later *Chapman* case extending the scope of analysis of harmless constitutional error and declining to adopt any automatic reversal rule but analyzing each case on a case-to-case basis to determine harmless or prejudicial error. So viewed *Bollenback & Brotherhood of Carpenters* would be limited to holding that under the particular facts and circumstances of those cases, the unconstitutional presumption was prejudicial error.

*McKenzie* is a case where no inadmissible evidence was presented to the jury. The jury heard no tainted evidence. The proof presented by the state was essentially undisputed and uncontroverted. The sole exception was the conflicting testimony of psychiatrists called by the state and the defendant relating to the capacity of the defendant to form the intent required to constitute the crimes of which he was convicted. The verdict of the jury necessarily determined that defendant had the capacity to form the requisite intent. No unconstitutional presumptions were given the jury concerning defendants mental capacity.

Given that mental capacity, the question remains whether defendant in fact had the requisite intent when he kidnapped and killed the victim. Here the evidence is undisputed and permits only one rational conclusion.

From the beginning there was no real or genuine question regarding intent in this case. There was uncontroverted and compelling evidence of the vicious manner in which the crimes were committed from which no rational conclusion could be drawn that the defendant lacked the intent to kidnap and kill the victim. The pathologist who examined the body of the victim testified how the killing occured. He stated that there was evidence of sexual intercourse in close proximity to the time of death and that a dry stain in the victim's pubic hair vaginal canal contained human male semen. He also testified that the evidence was consistent with the fact the victim had been dragged. Nine abraded bruises were found on the front part of the victim's chest in the area of her breasts. A segment of used clothesline rope had been found around the victim's neck which had been severly constricted about 45 minutes before her death causing injuries severe enough to completely compress the airway into her lungs. Finally, there was evidence of several blows to the victim's head. The death blow had left open the entire side of her head. Blood and brain tissue matching those of the victim were found on the exhaust manifold.

There is no other evidence. The evidence on the issue of intent is overwhelming, uncontradicted, and permits but one rational conclusion — that defendant purposely and knowingly intended to kidnap and kill her. We conclude that a reasonable juror could not have found otherwise on the proof presented by the State, the instructions on rebuttable presumptions notwithstanding. See *State v. Hamilton* (1980), 185 Mont. 522, 605 P.2d 1121. Regardless of the jury instructions on rebuttable presumptions, the verdict could not have been otherwise. We declare a belief that the unconstitutional jury instructions were harmless beyond a reasonable doubt in the context of the undisputed evidence in this case, that the assigned error could not have contributed to the verdict in this case.

Affirmed.

DALY, J., and W.W. LESSLEY sitting in place of MR. JUSTICE HARRISON and JACK D. SHANSTROM, **, sitting in vacant seat on the Court, District Judge concur.

MR. JUSTICE SHEA dissents and filed opinion.

MR. JUSTICE SHEA dissenting:

Before setting forth the basis of my dissent, it would perhaps be helpful to place this case in its procedural prospective. This Court decided the first *McKenzie* case on November 12, 1976. *State v. McKenzie* (1976), 171 Mont. 278, 557 P.2d 1023. I was not a member of this Court at that time. The case then traveled to the United States Supreme Court on a petition for writ of certiorari.

On July 29, 1977, the United States Supreme Court remanded the case to be reheard in light of *Patterson v. New York* (1977), 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281. When the case was again orally argued, I was a member of this Court. In addition to addressing itself to the *Patterson v. New York* issue, this Court again issued a full opinion. Other than the *Patterson* issue, it was for the most part, simply a repeat of the first *McKenzie* decision. *State v. McKenzie* (1978), 177 Mont. 280, 581 P.2d 1205. I dissented to that opinion on the search and seizure question and on the death penalty question (581 P.2d 1235-1277).

*THE SEARCH AND SEIZURE QUESTION*

I concluded that the searches and seizures in this case blatantly violated defendant's constitutional rights under the Montana and United States Constitutions and therefore that the evidence seized and the fruits of the illegally obtained evidence should have been suppressed. 581 P.2d 1235-1266. Defendant was convicted by the use of illegally seized evidence and was thus entitled to a new trial. My views have not changed on the search and seizure question; indeed, they are even more resolute. This is a very strong case for suppression of evidence. Expressed as moderately as possible, the search and seizure violations which occured in this case are appalling.

There is no need, however, to again set forth my dissent in this opinion. My views expressed in the second *McKenzie* case (581 P.2d 1235-1266) shall constitute my views here on the search and seizure questions. No doubt I could write a stronger dissent, but time constraints do not permit a rewriting. I think it appropriate, however, to comment on one case that we have decided since the second *McKenzie* case.

In *Thompson v. Onstad* (1979), 182 Mont. 119, 594 P.2d 1137, this Court unanimously confirmed what my position had always been in relation to Montana law and the requirement that an application for a search warrant must contain probable cause within the four corners of the document itself, without reference to any extraneous oral statements or testimony. This Court reconfirmed the four-corner requirement:

"However, regardless of whatever additional information Hallett provided to the judge who issued the warrant, the failure to put that information in writing precludes our consideration of whether it might have cured the insufficient affidavit. This Court has previously construed Article II, Section 11 of the 1972 Montana Constitution to require that *all* facts relied upon by the issuing magistrate be included in writing in the sworn affidavit. *State ex rel. Townsend v. District Court* (1975), 168 Mont. 357, 362-63, 543 P.2d 193, 196. See also, *United States v. Anderson* (9th Cir. 1971), 453 F.2d 174, 177 & n. 3; *Petition of Gray* (1970), 155 Mont. 510, 520, 473 P.2d 532, 537. Cf. *Stone v. Powell*, 428 U.S. at 473, n. 3, 96 S.Ct. at 3042, n. 3, 49 L.Ed.2d at 1075, n. 3." 594 P.2d at 1139.

From this quotation there is no doubt that this Court not only considers this to be the law, but also that this has always been the law in this state. These constitutional requirements under both the United States and Montana Constitutions certainly predated the search and seizure involved in this case. For reasons that I am unable to comprehend, this Court has suspended the application of this law to defendant *McKenzie* here. This was one of the major points of my dissent on the search and seizure questions, and it is

why I so meticulously set forth the facts and circumstances surrounding the search and seizure. 581 P.2d 1235-1266.

We thus arrive at the issuance of the present opinion. This case was again decided because the United States Supreme Court directed us to do so. The Supreme Court ordered us to reconsider it in light of *Sandstrom v. State of Montana* (1979), 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39. The specific order of the United States Supreme Court provided:

"WHEREAS, lately in the Supreme Court of the State of Montana, there came before you a cause between The State of Montana, plaintiff and respondent, and Duncan Peder McKenzie, Jr., defendant and appellant, No. 13011, wherein the judgment of the said Supreme Court was duly entered on the seventh day of June, 1978, as appears by an inspection of the petition for writ of certiorari to the said Supreme Court and the response thereto.

"AND WHEREAS, in the 1978 Term, the said cause having been submitted to the SUPREME COURT OF THE UNITED STATES on the said petition for writ of certiorari and response thereto.

"ON CONSIDERATION WHEREOF, it was ordered and adjudged on June 25, 1979, by this Court that the judgment of the Supreme Court of Montana in this cause be vacated, and that this cause be remanded to the Supreme Court of the State of Montana for further consideration in light of *Sandstrom v. Montana*, 442 U.S. [510, 99 S.Ct. 2450, 61 L.Ed.2d 39] (1979).

"NOW, THEREFORE, THE CAUSE IS REMANDED to you in order that such proceedings may be had in the said cause, in conformity with the judgment of this Court above stated, as accord with right and justice, and the Constitution and Laws of the United States, the said writ notwithstanding."

In light of the specific direction to reconsider this case in light of *Sandstrom v. State of Montana*, I do not know whether this Court was again required to issue a full opinion or simply to rule on the questions raised by the *Sandstrom* case. Whatever the case may be, the majority issued a full opinion on all issues raised by the defendant, and thus I assume the opinion speaks from the date of decision

on all issues decided. If such is the case, I fail to understand why the majority did not consider the search and seizure question again and decide it in defendant's favor. *Thompson v. Onstad*, supra, requires this result.

The majority opinion ignores any reference to *Thompson v. Onstad.* Why? The search and seizure violations committed against *Thompson* are pale beside the violations committed in this case. There is no doubt that this Court has not given the full and fair consideration to *McKenzie's* claims that his Fourth Amendment rights were violated. Indeed, by its decision it is clear beyond any doubt that the Court has carved out another special *McKenzie* rule in the law of search and seizure. As to McKenzie, the Fourth Amendment is dead and buried.

## THE DEATH PENALTY STATUTES

In the *second McKenzie case*, I dissented on the question of whether the sentencing statutes and appellate review statutes in existence at the time of the commission of the crimes involved, passed constitutional muster. I concluded that they did not. Undoubtedly, by writing another dissent here on the same question, I could better state my position. Time constraints, however, do not permit me to do so. For this reason, my dissent in *State v. McKenzie* (1978), 177 Mont. 280, 581 P.2d 1235-1277 shall constitute my dissent here on the same question.

I do have a few brief comments, however, in relation to the majority adding the case of *State v. Coleman* (1979), 185 Mont. 299, 605 P.2d 1000, in support of its position on the death penalty. The majority states:

"In short, we believe the Montana statutory scheme in existence at the time of the crimes herein, affords defendant the procedural safeguards necessary to protect the substantive rights to be sentenced without arbitrariness or caprice. *State v. Coleman*, supra."

Other than citing *Coleman*, the statement made is precisely the same as made in the *second McKenzie case* (581 P.2d at 1229). *Coleman* has absolutely no application to this case. The question in

*Coleman* was whether the 1977 death penalty statutes could be retroactively applied to crimes committed in 1974. The question here is whether the general sentencing statutes and general appellate review statutes in existence at the time of the commission of the crimes (January 21, 1974) provided sufficient procedural and substantive protections to satisfy the requirements set forth by the United States Supreme Court. *Coleman* therefore, lends no support to the death penalty issues presented in this case.

By concentrating in this dissent on the issues raised by the *Sandstrom*-type instructions used in this case, I do not mean to imply that I agree with all those portions of the majority opinion upon which I have no specifically expressed disagreement by writing a dissent. The simple fact is that the entire opinion is lacking, but I do not have the time to address all of those issues raised. Suffice to say that if ever a case came to an appellate court as a monumental mess, this is it.

I direct the remainder of this dissent to the issue of whether the repeated use of the *Sandstrom*-type instructions in this case are, beyond a reasonable doubt, harmless error. I do not believe that any appellate court could, under the circumstances of the repeated use of these unconstitutional instructions, declare that the error is harmless. For this reason, I believe that the convictions must be reversed.

In *Sandstrom v. State of Montana*, supra, the United States Supreme Court held that the presumption that one intends the consequences of his voluntary act is unconstitutional. This Court had not, however, passed on the issue of whether the constitutional error was harmless beyond a reasonable doubt. For this reason the United States Supreme Court did not decide this issue and remanded the case to this Court for our initial consideration. In effect, that is what the United States Supreme Court directed this Court to do in the present case.

In granting Sandstrom a new trial after the constitutional issue was again argued in this Court, we declared that Sandstrom was entitled to a new trial because we could not declare beyond a

reasonable doubt that the unconstitutional presumption did not influence to some degree the decision of the jury. *State v. Sandstrom* (1979), 184 Mont. 391, 603 P.2d 244. In *Sandstrom*, we also set forth what we considered the correct test to be for the assessment of constitutional error. I fail to see how McKenzie should not have the benefit of the same decision — that is, granting him a new trial. The errors committed in this case are overwhelming in comparison to the one unconstitutional presumption which tainted the *Sandstrom* conviction and required a reversal and new trial.

*THE MAJORITY APPROACH TO CONSTITUTIONAL ERROR ELIMINATES THE NEED TO INSTRUCT THE JURY ON THE LAW OF THE CASE.*

In *Sandstrom v. State of Montana*, the United States Supreme Court declared that in determining whether constitutional error in instructions is harmless, an appellate court must review *the instructions* as reasonable jurors would view them. 442 U.S. at 514, 99 S.Ct. at 2454, 61 L.Ed.2d at 45. The focus is clearly on the instructions rather than on the evidence. Indeed, any other view would ignore the issue. In adopting the "overwhelming evidence" test here, the majority has totally eliminated any need to focus on the jury instructions to assess the possible impact they had on the decision making process of the jury.

In holding that the unconstitutional jury instructions constitute harmless error, the majority takes essentially a four-step approach. The fourth step is the actual application of the "overwhelming evidence" test for assessing the impact of constitutional error inhering in jury instructions. The analysis defies logic.

First, the unconstitutional instructions are analyzed and the Court determines that a reasonable jury would conclude the presumptions created are rebuttable rather than conclusive. Second, the Court declares that even the rebuttable presumptions are unconstitutional under the rationale of *Mullaney v. Wilbur* (1975), 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508, and therefore that a constitutional error analysis must be undertaken. I note here,

however, that this second step is not necessary. The United States Supreme Court had already declared in *Sandstrom* that similar instructions were unconstitutional regardless of whether they created conclusive presumptions or rebuttable presumptions. The case was sent back here for the sole purpose of determining whether or not the constitutional error was harmless. Third, the majority then decides that the best test for assessing the impact of constitutional error inhering in jury instructions is the "overwhelming evidence" test. *Milton v. Wainwright* (1972), 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1, is cited as authority for application of the "overwhelming evidence test". And fourth, the Court then confines itself solely to an analysis of the evidence (rather than to an analysis of the unconstitutional instructions) and declares that the evidence of guilt is overwhelming and therefore the verdicts must be upheld. This approach constitutes a total abdication of our duty, which is to assess the impact of the unconstitutional instructions on the decision making process of the jury. It is not our function to be the fact finder.

This approach to constitutional error obviates the need to ever instruct the jury on the law, and therefore obviates the need for the jury to ever follow the law. All that is required now, it seems is that the jury be provided only with the appropriate verdict forms and a conviction will be sustained if, in the minds of the majority of an appellate court, the evidence of guilt is overwhelming. I do not believe the United States Supreme Court could, in good conscience, let this Court get away with this approach to the assessment of constitutional error inhering in jury instructions.

It is not simply that this Court had adopted an entirely unacceptable test for the assessment of constitutional error inhering in jury instructions. Moreover, this Court, in two recent cases, adopted and used a different standard to assess the impact of jury instructions on the ultimate decision of the jury. *State v. Sandstrom* (1979), 184 Mont. 391, 603 P.2d 244; *State v. Hamilton* (1980), 185 Mont. 522, 605 P.2d 1121. No explanation whatsoever is offered for the failure to use the same test in this case.

## BY ADOPTING THE "OVERWHELMING EVIDENCE" TEST TO APPLY TO THIS CASE, THE COURT HAS IGNORED STATE V. SANDSTROM AND STATE V. HAMILTON

In adopting the "overwhelming evidence" test, the majority states:

"We find nothing in *Sandstrom* inconsistent with adopting this approach to determine harmless error. In *Sandstrom* the United States Supreme Court expressly declined to reach the issue of harmless error as an initial matter as the Montana Supreme Court had not ruled on this issue. *On remand, we granted a new trial to Sandstrom on grounds unrelated to the overwhelming evidence standard in assessing harmless error.*" (Emphasis added.)

It is true that the United States Supreme Court did not direct us to follow any particular test in assessing the impact on the unconstitutional instructions on the verdicts of the jury. But it is equally true that we were directed to consider the impact of the unconstitutional instruction on a reasonable jury. How would a reasonable jury view the unconstitutional instruction? We were not freed, as the majority implies here, to confine our analysis to the so-called "overwhelming evidence of guilt", which is precisely what the majority has done.

Nor can I make any sense out of the majority statement that "on remand, we granted a new trial to Sandstrom on grounds unrelated to the overwhelming evidence standard in assessing harmless error." The fact is that on remand we granted a new trial to Sandstrom because, in analyzing the unconstitutional instruction and its possible impact on the jury, we could not declare beyond a reasonable doubt, that the error was harmless. If we applied this standard in deciding the *Sandstrom* case on remand, why didn't we use the same standard here? Isn't defendant McKenzie entitled to an application of the same test as we used in *Sandstrom?* If not, why not?

In discussing the impact of the unconstitutional instruction and the test for assessing this impact, this Court stated in the *Sandstrom* decision on remand:

"In summary, the issue presented is whether the erroneous instruction constituted harmless error as against the defendant. The instruction reads: "The law presumes that a person intends the ordinary consequences of his voluntary acts.' "Before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt. *Chapman v. State of California* (1967), 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705. In so holding, the Supreme Court in *Chapman* reaffirmed its holding in *Fahy v. State of Connecticut* (1963), 375 U.S. 85, 86-87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171, 173; '[t]he question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.'

"Under *Fahy* and *Chapman*, unless we can find harmless error, the conviction must be reversed. To constitute harmless error, we must be able to assent as a Court that the offensive instruction could not reasonably have contributed to the jury verdict. In considering the instruction, and the fact that intent was the main issue in the District Court trial we cannot make that assertion. The erroneous instruction goes to a vital element of the proof of the crime, namely the intent of the defendant Sandstrom in committing the homicide. If the jury followed the instruction, it would have presumed the intent without proof beyond a reasonable doubt." (Emphasis added.) 603 P.2d at 245, 36 St.Rep. at 2100.

It is patently clear that in *Sandstrom*, this Court used a different test for measuring the impact of constitutional error than what the majority has used in the present case. Furthermore, the Court in *Sandstrom* focused on the instruction itself. Thus the statement: "If the jury followed the instruction it could have presumed the intent without proof beyond a reasonable doubt." It is equally clear, furthermore, that the *Sandstrom* test we applied does not depend upon the quality or quantity of the evidence stacked up against the defendant. Rather, it depends upon the possible effect which the unconstitutional instruction had on the decision making process of the jury. Any other test is not a test for constitutional error inherent in jury instructions.

Even more recently, in *State v. Hamilton*, supra, this Court applied the *Sandstrom* test although we affirmed the conviction. (Indeed, I feel now that I was in error in signing the majority opinion declaring the error in *Hamilton* to be harmless.) In *Hamilton*, we stated:

"Recently, this Court has made the following observation: 'To constitute harmless error, we must be able to assent as a Court, that the offensive instruction could not reasonably have contributed to the jury verdict.' *State v. Sandstrom* (1979), 184 Mont. 391, 603 P.2d 244, at 245. This statement indicates that the law in Montana as to harmless error is closer to the *Harrington* test. That is, the appellate court determines the impact of the error upon a reasonable jury. If the impact of the instruction could not have reasonably contributed to the verdict then the error is harmless. That such an approach is correct is emphasized by the United States Supreme Court. They said that the proper analysis of an instruction begins with 'the way in which a reasonable juror could have interpreted the instruction.' 442 U.S. at 514, 99 S.Ct. at 2454, 61 L.Ed.2d at 45." 605 P.2d at 1132, 37 St.Rep. at 82-83.

This language again leaves no doubt that until the present *McKenzie* case, this Court believed that its duty in assessing constitutional error inhering in jury instructions, was to analyze and assess the impact of the offending instruction on the decision making process of the jury.

Now, however, in less than two months' time, this Court, has, at least for the present case, completely abandoned the *Sandstrom* and *Hamilton* test, and replaced it with a meaningless "overwhelming evidence" test. If we are going to change the rules every couple months, we should at least explain why we are doing so by citing the cases we are abandoning or disregarding, and explain why these cases either do not apply or why we choose not to apply them. The failure to follow the test set forth in *Sandstrom* and *Hamilton* can only be explained as the carving out of a special and meaningless test for constitutional error to apply to defendant McKenzie.

*AUTOMATIC REVERSIBLE ERROR CAN BE THE CONSE-QUENCE OF THE FAILURE OF STATE APPELLATE COURTS TO FAITHFULLY ADHERE TO THE RULE SET FORTH IN CHAPMAN V. CALIFORNIA.*

Not long after the United States Supreme Court decided *Chapman v. California*, Chief Justice Traynor of the California Supreme Court wrote an informative book entitled, *The Riddle of Harmless Error* (1969), Ohio University Press. His main theme was that the *Chapman* test for measuring constitutional error is too stringent and that a less exacting standard could and should be adopted without jeopardizing the rights of a defendant. But he also warned state appellate courts that if they did not adhere to the *Chapman* test it would be supplanted with a rule of automatic reversal. He stressed that the statement in *Chapman* that " 'we cannot leave to the States the formulation of authoritative laws, rules, and remedies designed to protect people from infraction by the States of federally guaranteed rights' " was a sure sign that the Supreme Court demands adherence to the *Chapman* test. With reference to this quote from *Chapman*, he stated:

". . . That statement is of some import in the light of the Court's latter-day procedural safeguards for criminal defendants. Unless strictly monitored courts not in sympathy with these safeguards could violate them by holding their violation harmless. The Supreme Court may have been apprehensive of an easy route to affirmance despite constitutional error, via tests more lenient than the *Chapman* test and more difficult to monitor. The very stringency of the *Chapman* test is enough to suggest that unless it is faithfully followed, the Supreme Court will supplant it with a rule of automatic reversal.

"The *Chapman* test itself comes close to automatic reversal. A court faithful to the *Chapman* test could hold that the violation of a constitutional right did not contribute to the judgment, and hence was harmless only if it could declare a belief to that effect beyond a reasonable doubt, a belief approaching certainty. . . ." 386 U.S. [18] 43, 44, 87 S.Ct. 824, 17 L.Ed.2d 705.

If what this Court has done in this case is any indication of the attitude of most state courts toward federal constitutional rights, I can think of no more convincing reason for the United States Supreme Court to adopt a rule of automatic reversal. Unfortunately, it appears that the Supreme Court is in part responsible for this attitude of state courts because of its own failure to adopt an undeviating rule for the assessment of the effect of constitutional error on the decision making processes of a jury. But whatever the test may be, I am confident that the United States Supreme Court will not accept the test and analysis the majority has used in this case.

THE "OVERWHELMING EVIDENCE" TEST AS ADOPTED AND APPLIED HERE, OMITS THE ESSENTIAL INGREDIENT OF ASSESSING THE IMPACT OF THE UNCONSTITUTIONAL INSTRUCTIONS

Out of the void created by the apparent failure or inability of the United States Supreme Court to fashion an undeviating rule for the assessment of constitutional error, the majority here has declared that it is free to adopt any one of three rules that appear to have met the approval of the United States Supreme Court. The choices available are described as follows:

". . . At least three definable approaches appear in United States Supreme Court cases: (1) Focusing on the erroneously admitted evidence or other constitutional error to determine whether it might have contributed to the conviction, e.g., *Fahy v. Connecticut* (1963), 375 U.S. 85, 54 S.Ct. 229, 11 L.Ed.2d 171; (2) excluding the constitutional infirmity where overwhelming evidence supports the conviction e.g., *Milton v. Wainwright* (1972), 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1; (3) determining whether the tainted evidence is merely cumulative or duplicates properly admitted evidence e. g., *Harrington v. California* (1969), 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284."

The majority cites two law review articles which apparently support the conclusion that three distinct rules exist for the assessment of constitutional error. *Assessing the Harmlessness of Federal Con-*

*stitutional Error—A Process In Need of a Rationale*, Univ. of Pennsylvania L.Rev., Dec. 1976, Vol. 125, No. 2; *Harmless Error, The Need for a Uniform Standard*, St. John's L.Rev., Vol. 53, Spring 1179, No. 3. The majority neglects to mention, however, that neither article remotely touches upon the issue of how to treat constitutional error inhering in jury instructions. The most probable reason is that the authors of both articles assumed, as most people would assume, that unconstitutional jury instructions cannot be treated in the same manner as evidence which has been invalidly admitted at a defendant's trial.

Assuming, moreover, that *Milton v. Wainwright*, supra, sets forth a *separate* "overwhelming evidence" test for the assessment of constitutional error, I fail to see how it can be applied to unconstitutional jury instructions.

In *Milton v. Wainwright*, the United States Supreme Court held that an invalidly obtained confession admitted as evidence was harmless error because three additional confessions made by the defendant had been validly admitted as evidence. There, a police officer posing as a fellow prisoner, was confined in the same cell as the defendant in order to obtain his confidence, and then illegally obtained the defendant's confession. This confession was admitted as evidence at defendant's trial in violation of his Fifth and Sixth Amendment rights. But the Supreme Court affirmed, holding that because the State had validly admitted three additional confessions, the illegally admitted confession was merely cumulative to the three validly admitted confessions, and thus the constitutional error was declared, beyond a reasonable doubt, to be harmless.

I do not believe that *Milton v. Wainwright* has any viability in relation to an application to unconstitutional jury instructions. But if the basic analytical approach has any application, an appellate court would then be required to look at all the instructions together to determine if the impact of the unconstitutional jury instructions was somehow nullified or neutralized by additional instructions on the same point which properly stated the law. This approach breaks down, however, because an appellant court would then be

placed in the untenable position of declaring that the jury, beyond a reasonable doubt, followed the valid instructions as opposed to the invalid instructions. I doubt that an appellate court would have the temerity to declare that beyond a reasonable doubt, the jury disregarded the unconstitutional instructions and followed only the constitutional instruction in its decision making processes.

Any test for harmless error with relation to unconstitutional jury instructions must minimally involve a consideration of whether the jury was influenced by the unconstitutional instructions. Here, the majority has omitted this analysis in adopting its "overwhelming evidence" test.

In stating its reasons for adopting the "overwhelming evidence" test the majority first declares that this test "addresses the realities of the jury trial to a greater degree than the others *in context of the McKenzie case . . .*" (Emphasis added.) What does this statement mean? Is the Court declaring that a special test must be applied to *McKenzie* that would not be applied to other cases involving unconstitutional jury instructions? What is so special about the *McKenzie* case which requires a special test for assessing the impact of constitutional error? The opinion sheds no light on these questions.

But in the next breath, the Court seems to be adopting an "overwhelming evidence" test to apply to all cases involving constitutional error. This test is preferable, the Court declares, because "an appellate court should view the case as a whole in assessing harmless or prejudical error and not confine itself to a review of only one component of the case in artificial isolation, in this case the jury instructions." Is the Court here adopting an undeviating rule for the assessment of constitutional error inhering in jury instructions? If so, why didn't the court overrule *State v. Sandstrom*, supra, and *State v. Hamilton*, where, just a short while ago, we used a different test for the assessment of the impact of constitutional error? Again, the opinion sheds no light on these questions.

I agree that unconstitutional jury instructions should not be treated as in a vacuum, that is, not assessed in terms of the evidence

and issues existing in the particular case. Nor does the United States Supreme Court require us to so consider them. Essentially, an appellate court has three choices in viewing the impact of the constitutional error: to focus exclusively on the unconstitutional instructions (a clearly unacceptable choice); to focus exclusively on the evidence (another clearly unacceptable choice and the one adopted by the majority here); or to focus on the unconstitutional instructions in relation to the issues and evidence existing in the case. In the absence of a rule of automatic reversal for unconstitutional jury instructions, the only meaningful choice is the last.

## AN APPELLATE COURT MUST ASSUME THAT JURORS UNDERSTAND THE LAW AND CONSCIENTIOUSLY APPLY THE LAW TO THE CASE

An appellate court can, in determining whether or not erroneous jury instructions constitute harmless error, view them in three ways. Traynor, *The Riddle of Harmless Error* (1969), the Ohio University Press, pp. 73-74. Obviously, the impact of an erroneous instruction (or instructions) depends upon the view taken.

Under the first view the appellate court assumes "that a jury understands and faithfully follows the court's instructions." (Id. at 73.) This being the case, "any substantial error in an instruction is bound to influence the jury and therefore calls for a reversal." (Id. at 73.) This view according to Traynor, is the only respectable view an appellate court can take if the law is to have any meaning at all. Applied to unconstitutional error inhering in jury instructions, this would mean that an appellate court must assume that the jury followed the unconstitutional instructions and thus a reversal would be required.

On the other hand, the opposite view operates on the premise "that a jury in the main is mystified by the legal abstractions in an instruction even when the instruction is not unduly complicated by abstruse language." (Id. at 73.) Operating on this assumption, an appellate court could then declare that "errors [in the instructions] would have no more influence on the jury than the instruction itself and hence would ordinarily be harmless." (Id. at 73.) Although the

majority here has not adopted this position in so many words, it is clear that the adoption of and application of the "overwhelming evidence" test to this case is premised on an assumption that jury instructions are nothing more than window dressing. Underlying the court's opinion is an assumption that the jury paid no attention to any of the trial court's instructions, and therefore that the jury could not have paid any attention to the unconstitutional instructions.

The middle ground position operates on the premise that "instructions are indeed mystifying but it is impossible to know whether or not a jury managed to comprehend them." Id. at 72. This being the case, "an appellate court is unable to declare a belief one way or the other as to the effect on the verdict of an error in an instruction. Hence the error would ordinarily be deemed prejudicial rather than harmless." Id. at 73.

Traynor suggests, however, that the only honorable choice is to assume that juries do understand and follow the instructions.

"In the absence of definitive studies to the contrary, we must assume that juries for the most part understand and faithfully follow instructions. The concept of a fair trial encompasses a decision by a tribunal that has understood and applied the law to all material issues in the case. . . ." Id. at 73-74.

If a jury is not required to follow the law as instructed by the trial court it is freed to decide the case on any basis it chooses as long as the appellate court can, on appeal, make a determination that the verdict is supported by "overwhelming evidence." Obviously, if a jury does not have to follow the law, there is no need to give the law to the jury to follow. This approach has as its bedrock, an assumption that jury instructions are nothing more than window dressing. But if the law is to have any meaning at all the legal system cannot tolerate this state of affairs for it would mean no less than jury anarchy condoned by the judiciary.

Here, the unconstitutional jury instructions (eight in number) played no role whatsoever in the majority opinion finding harmless error. The majority jumped over the unconstitutional instruc-

tions, landed on the "overwhelming evidence" and in the same breath affirmed the convictions. I cannot believe for one moment that the United States Supreme Court would declare this to be an acceptable test for assessing the impact of constitutional error.

Aside from the unconstitutionality of several jury instructions, there is a very real problem existing in this case with relation to the instructions. The instructions were long, confusing, and often contradictory. No doubt much of the confusion was caused by the horrible form in which the charges were filed. This situation alone, absent the unconstitutional instructions, would be sufficient to reverse the case and grant a new trial. My analysis of the jury instructions, however, rests on the assumption that the jury understood (or attempted to understand as best if could) the jury instructions and conscientiously applied them (as best it could) to the issues existing in this case.

## THE CHARGES FILED IN THIS CASE

The charges filed in this case, together with the jury instructions attempting to cover the charges involved, permit only one rational conclusion—total confusion. In the context of this case there is no way that one can plod his way through the morass of instructions and determine the processes by which the jury reached its guilty verdicts.

On January 1, 1974, the new substantive crimes code went into effect in this state. The offenses charged in this case were allegedly committed on January 21, 1974, and therefore the crimes were charged under the new criminal code. Perhaps the new code helps to a degree in explaining the confusion surrounding this case.

The charges filed in this case are virtually incomprehensible. Out of a relatively simple fact pattern comes such a scatter gun approach that it would take a great amount of time for the best law firm to unravel. At the conclusion of the trial, the trial court instructed the jury in the precise wording of the charges as filed. Instruction 6, Statement of the Case. One can appreciate the complexity and intricacy of the charges only by viewing the charges as given to the jury. They read as follows:

"That Duncan Peder McKenzie, Jr., late of the County of Pondera, on or about the 21st of January, A.D. 1974, at the County of Pondera in the State of Montana, committed the crimes charged in the following counts, all at locations in Pondera County, Montana:

"COUNT I: THAT DUNCAN PEDER McKENZIE JR., committed the crime of DELIBERATE HOMICIDE, a felony by purposely or knowingly causing the death of LANA HARDING, a human being; in violation of Section 94-5-101 and Section 94-5-102, R.C.M.1947.

"COUNT II: THAT DUNCAN PEDER McKENZIE, JR., committed the crime of DELIBERATE HOMICIDE, a felony, by purposely or knowingly causing the death of LANA HARDING, a human being, while the said DUNCAN PEDER McKENZIE, JR., was engaged in the commission of, or in an attempt to commit, or flight after committing or attempting to commit:

"1. SEXUAL INTERCOURSE WITHOUT CONSENT, a felony, by knowingly having sexual intercourse with the said LANA HARDING, a female not his spouse, without consent, the said DUNCAN PEDER McKENZIE, JR., being male person; or

"2. AGGRAVATED ASSAULT, a felony involving the use or threat of physical force or violence against the said LANA HARDING by purposely or knowingly causing:

"a. Serious bodily injury to the said LANA HARDING: or

"b. Bodily injury to the said LANA HARDING with a weapon, namely:

"(1) a rope by placing said rope around the neck of the said LANA HARDING: or

"(2) a heavy object, by striking the said LANA HARDING upon her head with said heavy object; or

"that the said DUNCAN PEDER McKENZIE, JR., committed the crime of DELIBERATE HOMICIDE, a felony as above alleged, by purposely or knowingly causing the death of the said LANA HARDING:

"1. by means of torture; or

"2. by lying in wait or ambush in violation of Sections 94-5-101, 94-5-102, 94-5-503, and 94-5-202, R.C.M. 1947.

"Count 3. That DUNCAN PEDER McKENZIE, JR. committed the crime of AGGRAVATED KIDNAPPING, a felony, by knowingly or purposely and without lawful authority restraining LANA HARDING by either secreting or holding the said LANA HARDING in a place of isolation, or by using or threatening to use physical force with the purpose of facilitating the commission, or flight thereafter, of the felony:

"1. SEXUAL INTERCOURSE WITHOUT CONSENT, by knowingly having sexual intercourse with the said LANA HARDING a female not his spouse, without consent, the said DUNCAN PEDER McKENZIE, JR., being a male person; or

"2. AGGRAVATED ASSAULT, by purposely or knowingly causing:

"(a) serious bodily injury to the said LANA HARDING; or

"(b) bodily injury to the said LANA HARDING with a weapon, namely:

"1. a rope, by placing said rope around the neck of the said LANA HARDING: or

"2. a heavy object, by striking the said LANA HARDING upon her head with the said heavy object;

"in violation of Sections 94-5-303, 94-5-503, and 94-5-202, R.C.M. 1947, the said LANA HARDING having died as a result of said criminal conduct.

"COUNT 4. That DUNCAN PEDER McKENZIE, JR., committed the crime of AGGRAVATED KIDNAPPING, a felony, by knowingly or purposely and without lawful authority restraining LANA HARDING by either secreting or holding the said LANA HARDING in a place of isolation, or by using or threatening to use physical force, with the purpose of inflicting bodily injury on the said LANA HARDING or terrorizing the said LANA HARDING, in

violation of Section 94-5-303, R.C.M.1947, the said LANA HARD-ING having died as a result of said criminal conduct.

"COUNT 5. That DUNCAN PEDER McKENZIE, JR. a male person committed the crime of SEXUAL INTERCOURSE WITHOUT CONSENT, a felony, by knowingly having sexual intercourse with LANA HARDING, a female not his spouse, without consent, in violation of Section 94-5-503, R.C.M.1947.

"COUNT 6. That DUNCAN PEDER McKENZIE, JR., committed the crime of AGGRAVATED ASSAULT, a felony, by purposely or knowingly causing serious bodily injury to LANA HARD-ING, in violation of section 9-5-202 [94-5-202], R.C.M.1947.

"COUNT 7. That DUNCAN PEDER McKENZIE, JR. committed the crime of AGGRAVATED ASSAULT, a felony, by purposely or knowingly causing bodily injury to LANA HARDING with a weapon, namely

"1. a rope, by placing said rope around the neck of the said LANA HARDING: or

"2. a heavy object, by striking the said LANA HARDING upon her head with said heavy object;

"in violation of Section 94-5-202, R.C.M.1947."

From this maze of charges the trial court was expected to properly instruct the jury on the applicable law. A formidable task to say the least. Before the case was submitted to the jury for its decision the "charge" of deliberate homicide "by lying in wait or ambush" was dismissed. Instruction 52 told the jury:

"The *charge* of Deliberate Homicide by Lying in Wait or Ambush has been dismissed by the Court and *you are not to concern yourselves with this charge in Count II* of the Information filed against the defendant." (Emphasis added.)

The issue before this Court on the remand from the United States Supreme Court is whether the unconstitutional *Sandstrom*-type presumptions contained in at least eight instructions, had any effect on the verdicts of the jury. That is, did the unconstitutional presumptions play any part in the decision making processes of the

jury in reaching its verdicts? Before an appellate court can uphold the convictions it must be prepared to state beyond a reasonable doubt that the jury verdicts were not affected at all by the use of the unconstitutional presumptions. It is impossible to make this declaration, and for this reason the verdicts must be reversed.

One of the underlying problems in this case which substantially defeats the ability of an appellate court to conduct meaningful review is that it is impossible to determine which path or paths the jury took to each of the convictions. Here, there were multiple charges and the jury was permitted to adopt one or more theories in finding defendant guilty of each of the offenses. Inability to determine the paths which a jury took substantially impairs, if it does not make it impossible, the ability of an appellate court to declare one way or the óther whether the *Sandstrom*-type instructions entered into the decision making process of the jury.

Of necessity, an analysis of the possible impact of the unconstitutional *Sandstrom*-type instructions on the jury verdicts, must be based on speculation. Indeed, since the trial court failed to provide a basis by which it can be determined how the jury reached its verdict, it is, in my judgment, sufficient to reverse the case on this basis alone. The benefit of any reasonable doubt as to how the jury reached its verdicts should be given to the defendant, and thus it must be assumed that the jury verdicts were impacted by the unconstitutional jury instructions.

Of necessity, an analysis of the possible impact of the unconstitutional *Sandstrom*-type instructions on the jury verdicts, ·must be based on speculation. Indeed, since the trial court failed to provide a basis by which it can be determined how the jury reached its verdict, it is, in my judgment, sufficient to reverse the case on this basis alone. The benefit of any reasonable doubt as to how the jury reached its verdicts should be given to the defendant, and thus it must be assumed that the jury verdicts were impacted by the unconstitutional jury instructions.

According to the enumerated charges, there were seven separate counts: Count 1, Deliberate Homicide; Count 2, Deliberate

Homicide; Count 3, Aggravated Kidnapping; Count 4, Aggravated Kidnapping; Count 5, Sexual Intercourse Without Consent; Count 6, Aggravated Assault; and Count 7, Aggravated Assault. But the charges are even more complicated than this, for within each broad charge of deliberate homicide, aggravated kidnapping, and aggravated assault, are several alternative methods by which the defendant is charged with having committed the crimes. All told, defendant is charged with committing the crimes involved in at least seventeen alternative ways.

The evils inherent in review under these circumstances are compounded by the fact that defendant was charged with (and may have been convicted) of the crime of deliberate homicide *"by means of torture"*—a nonexistent crime in this state. Furthermore, in both of the aggravating kidnapping counts the additional allegation was thrown in that defendant caused the death of the victim. The death of the victim is not, however, an element of the offense of aggravated kidnapping. It *is*, rather, an aggravating circumstance which, *if found by the court*, may result in the imposition of the death penalty absent mitigating circumstances.

## THE JURY INSTRUCTIONS

The unconstitutional *Standstrom*-type presumptions permeate the instructions given to the jury in this case. Instruction 31 sets the general tone by covering in great detail the use of presumptions as a tool in satisfying the proof in relation to the mental element involved with the particular crime. Furthermore, almost every count charged has corresponding instructions whereby *Sandstrom*-type presumptions are set forth.

In Count 1, Deliberate Homicide, the jury was told by Instruction 33 that the mental element involved could be proved by use of these *Sandstrom*-type presumptions. Count 2, Deliberate Homicide, involves essentially the invocation of the felony-murder rule, charging that defendant committed the homicide while committing, attempting to commit, or in withdrawing from the felonies of sexual intercourse without consent or aggravated assault. By Instruction 37, the jury was told that the element in-

volved in sexual intercourse without consent could be proved by use of the *Sandstrom*-type presumptions. By Instruction 38, the jury was told that the mental element involved in aggravated assault could be proved by use of the *Sandstrom*-type presumptions. A more detailed analysis will follow in another section of this dissent.

In Count 3, Aggravated Kidnapping, Instructions 37 and 38, supra, also have a direct bearing on this charge. Defendant was charged with aggravated kidnapping while attempting to commit, committing, or withdrawing from the felonies of sexual intercourse without consent or aggravated assault. Thus Instruction 37, mental element in relation to sexual intercourse without consent, and Instruction 38, mental element in relation to aggravated assault, must also be applied in the context of this charge of aggravated kidnapping. Again, the *Sandstrom*-type presumptions are involved. A more detailed analysis will follow in another section of this dissent.

The only count which *possibly* was not impacted by the unconstitutional *Sandstrom*-type instructions is Count 4, Aggravated Kidnapping. It *appears* that a jury could have fought its way through the maze of instructions and not used any of the *Sandstrom*-type presumptions to determine defendant's guilt under this count. But because of the deficient jury verdict forms, an appellate court does not know if the jury found defendant guilty of Count 4. Thus an appellate court would have to speculate that the jury did in fact convict defendant on Count 4 before it could undertake an analysis of the effect of the unconstitutional *Sandstrom*-type presumptions on the ultimate determination of guilt. A more detailed analysis will follow in another section of this dissent.

Count 5 charges sexual intercourse without consent, and Instruction 37 directs the jury to use the *Sandstrom*-type presumptions to find proof of the mental element involved. Counts 6 and 7 charge aggravated assault in alternative ways, and Instruction 38 applied to both counts and directs the jury to use the *Sandstrom*-type presumptions as proof of the mental element involved.

## VERDICT FORM INSTRUCTIONS AND VERDICT FORMS

In seeking to explain the maze of charges to the jury, the trial court attempted to put them in some kind of perspective by explaining in Instruction 6, Statement of the Case, the number of counts, and the number of potential convictions:

"Although defendant is charged with two counts in each of the offenses of Deliberate Homicide, Aggravated Kidnapping and Aggravated Assault, only one offense of Deliberate Homicide and one offense of Aggravated Kidnapping and one offense of Aggravated Kidnapping and one offense of Aggravated Assault are involved in this case. *Leave was granted the State of Montana to charge in this manner*, and to also charge the offense of Sexual Intercourse Without Consent, *in order to meet the problems of proof that arise when an offense or offenses can be committed in different ways, or by different means, or for different purposes. "The defendant can be convicted or acquitted on any or all of said offenses as you may find the allegations in each of said counts proved or not proved*, but in no event may be sentenced for more than one offense of Deliberate Homicide and more than one offense of Aggravated Kidnapping and more than one offense of Aggravated Assault even though you may find both of the counts with which he is charged to have been proved beyond a reasonable doubt." Instruction 6. (Emphasis added.)

By this instruction it is clear that the jury was free to find defendant guilty of both counts of deliberate homicide (Counts 1 and 2). Furthermore, the jury was free to find defendant guilty on both counts of aggravated kidnapping (Counts 3 and 4). The jury was free to find defendant guilty on both counts of aggravated assault (Counts 6 and 7). The court stated: "The defendant can be convicted or acquitted on *any or all* of said offenses . . ." Instruction 6. (Emphasis added.)

But even Instruction 6 is misleading as to the number of charges, for the defendant was charged with many alternative ways. Count 1 charges only one method of having committed deliberate homicide. But Count 2 alleges that the deliberate homicide was

committed in at least five alternative ways. One of the allegations within Count 2 is that the homicide was committed under circumstances which would call for the application of the felony-murder rule provided for in section 94-5-102(1)(b), R.C.M.1947. The felonies allegedly committed were sexual intercourse without consent or aggravated assault.

The deliberate homicide charges contained in Count 2 are further complicated by the allegation that the homicide was committed "by means of torture" or "by lying in wait or ambush." Indeed, neither death caused "by means of torture", or death caused as a result of "lying in wait or ambush", is an element of the crime of deliberate homicide. Rather, each of these elements is an aggravating circumstance under section 94-5-105, R.C.M.1947, whereby the death penalty may be imposed upon a finding of the existence of that circumstance, unless the sentencing court finds mitigating circumstances. Notwithstanding this rather fundamental fact, the State charged defendant with a substantive offense of deliberate homicide "by means of torture" and "by lying in wait or ambush" and both were treated thereafter as separate substantive offenses.

Although the charge of deliberate homicide "by lying in wait or ambush" was dismissed before it reached the jury, the charge of deliberate homicide "by means of torture" was consistently treated as a separate substantive offense, and it *appears* that the jury found defendant guilty of such charge.

Of all the alternatives available to the jury, there is no way of determining which one or more of the alternative methods the jury used in convicting defendant of deliberate homicide and of aggravated kidnapping. Indeed, the trial court specifically instructed the jury that the verdicts it reached did not have to reveal the path or paths it chose in reaching the verdicts.

With relation to the separate counts of deliberate homicide, the trial court told the jury:

". . . even though you may find more than one or more of said charges to have been proved beyond a reasonable doubt, as only

one death is alleged, only one Guilty of Deliberate Homicide verdict form is required. . ." Instruction 54, part II—Verdict Forms—Deliberate Homicide.

And, of course, the verdict form returned and signed by the jury, is equally as.nonrevealing as to the path or paths taken to reach its verdict:

"A. We, the jury in the above entitled cause find the defendant guilty of the offense of Deliberate Homicide as charged.

"B. We further find that the Deliberate Homicide was [was not] by Means of Torture.

"(Strike out the bracketed word or words which do not apply.)"

The same is true of the aggravated kidnapping charges. It cannot be determined which alternative or alternatives were used in reaching its verdict. The trial court instructed the jury:

"Since only one Aggravated Kidnapping is alleged, though in different ways and for different purposes, you are to consider all of the charges of Aggravated Kidnapping made against the defendant and *even though you may find more than one or all of the charges* of Aggravated Kidnapping *to have been proved* beyond a reasonable doubt *you are furnished with only one verdict form* upon which to return a verdict of Guilty of Aggravated Kidnapping.

". . .

"If you adopt the Guilty of Aggravated Kidnapping form you will be required to find on that form whether Lana Harding did or did not die as a result of the Aggravated Kidnaping." Instruction 54, part III — Verdict Forms — Aggravated Kidnapping. (Emphasis added.)

The guilty of aggravated kidnapping verdict form which the jury adopted and signed, reads as follows:

"A. We, the jury, in the above-entitled cause, find the defendant Guilty of the offense of Aggravated Kidnapping as charged.

"B. We further find that Lana Harding (did) (did not) die as a result of said Aggravated Kidnapping.

"(Strike out bracked word or words that do not apply)."

Thus, the trial court's own instructions, combined with the verdict forms he provided to the jury, present a situation on appeal where the appellate court has no way of determining the theory or theories used by the jury in finding defendant guilty of deliberate homicide and in finding him guilty of aggravated kidnapping. It is impossible to say, under these circumstances, that the *Sandstrom*-type presumptions did not figure in the decision making processes of the jury. For this reason alone, an appellate court should declare that under these circumstances constitutional error will be presumed to have affected the decisions of the jury. Accordingly, the convictions should be reversed.

The jury could have, furthermore, failed to unanimously agreed to any single theory or set of theories in arriving at its decision. If this is the case defendant was deprived of his constitutional right to a unanimous jury verdict. Montana Constitution, Art. II, § 26; section 95-1901, R.C.M.1947. As stated in *United States v. Gipson* (1977), 553 F.2d 453, 457:

"The unanimity rule thus requires jurors to be in substantial agreement as to just what a defendant did as a step preliminary to determining whether the defendant is guilty of the crime charged. Requiring the vote of twelve jurors to convict a defendant does little to insure that his right to a unanimous [jury] verdict is protected unless this prerequisite of jury consensus as to the defendant's course of action is also required." 553 F.2d at 457-458.

In reversing a defendant's conviction because the court was not able to ascertain the basis of the jury verdict, the court in *Gipson*, further stated:

"During argument, the government admitted, and the record shows that the prosecution presented evidence tending to show that Gipson performed each of these six acts prohibited by 18 U.S.C. § 2313. The possibility that the jury may have returned a guilty verdict in the face of a substantial rift among the jurors over the facts in the case, is, therefore, a real one. Because it is impossible to determine whether all of the jurors agreed that the defendant committed acts falling within one of the two conceptual groupings, we

cannot say that the district court's instruction was harmless beyond a reasonable doubt under *Chapman v. California*, 1967, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705." 553 F.2d 459.

Here, defendant was charged alternatively under two broad theories: (1). Deliberate homicide with the element required of "knowingly or purposely"; (2) Deliberate homicide under the felony murder rule where the state does not have to prove the mental element of "knowingly or purposely." Conceivably the jury could have avoided the *Sandstrom*-type presumptions by taking the felony-murder route to its verdict. But since there is no way of knowing that the jury did take this route, the rule of *Chapman v. California*, cited in *Gipson*, above, requires that the deliberate homicide conviction be reversed. Furthermore, because one cannot state beyond a reasonable doubt that the jury followed a constitutional path in reaching the aggravated kidnapping verdict, it too, must be reversed.

Analysis of the impact of the unconstitutional *Sandstron*-type instructions should not have to proceed beyond this point. Where the path or paths the jury took to its verdict cannot be determined beyond a reasonable doubt, any analysis of the path or paths it could have taken, is pure speculation. Nonetheless, because the majority has omitted entirely any analysis of the unconstitutional instructions in relation to their possible use by the jury in reaching its verdicts, I will do so. First, I will discuss the deliberate homicide conviction, and second the aggravated kidnapping conviction.

*DELIBERATE HOMICIDE—IMPACT OF THE SAND-STROM—TYPE INSTRUCTIONS OF THE DELIBERATE HOMICIDE CONVICTION*

As I previously stated, at some point before the case reached the jury for its deliberations, the charge of deliberate homicide "by lying in wait or ambush" was dismissed (see Instruction 52, supra). However, the so-called charge of deliberate homicide *"by means of torture"* remained for the jury's decision.

I must digress at this point to a vitally important and fundamental fact. Defendant was charged with deliberate homicide "by

means of torture", the jury was instructed that it was a separate offense, and instructions were given defining this so called offense. Furthermore, there is a reasonable likelihood that the jury may have convicted him of this offense. If this is so, defendant has been sentenced to death for a crime which does not exist in the statutes of this state.

The statute defining deliberate homicide at the time of the alleged crimes in this case, is section 94-5-102; R.C.M.1947. The entire statute reads as follows:

"94-5-102. Deliberate homicide.

"(1) Except as provided in section 94-5-103(1)(a), criminal homicide constitutes deliberate homicide if:

"(a) it is committed purposely or knowingly; or

"(b) it is committed while the offender is engaged in or is an accomplice in the commission of, or an attempt to commit, or flight after committing or attempting to commit robbery, sexual intercourse without consent, arson, burglary, kidnapping, felonious escape or any other felony which involves the use or threat of physical force or violence against any individual.

"(2) A person convicted of the offense of deliberate homicide shall be punished by death as provided in section 94-5-105, or by imprisonment in the state prison for any term not to exceed one hundred (100) years."

There is no other statute which creates or defines deliberate homicide. It is readily apparent that deliberate homicide "by means of torture" is not a substantive crime. It is, however, one of the statutory list of circumstances which, if found by the court after a conviction of deliberate homicide, may justify the imposition of the death penalty, absent mitigating circumstances. Section 94-5-105, referred to in section 94-5-102(2) above, provides as follows:

"94-5-105. Sentence of Death for Deliberate Homicide.

"(1) When a defendant is convicted of the offense of deliberate homicide the court shall impose a sentence of death in the following circumstances, unless there are mitigating circumstances:

"(a) The deliberate homicide was committed by a person serving a sentence of imprisonment in the state prison; or

"(b) The defendant was previously convicted of another deliberate homicide; or

"(c) The victim of the deliberate homicide was a peace officer killed while performing his duty or

"(d) *The deliberate homicide was committed by means of torture; or*

*(e) The deliberate homicide was committed by a person lying in wait or ambush; or*

"(f) The deliberate homicide was committed as a part of a scheme or operation which, if completed, would result in the death of more than one person." (Emphasis added.)

It is abundantly clear that the prosecutor mistakenly charged defendant with deliberate homicide "by means of torture" or "by lying in wait or ambush" when there was no statutory basis to charge him with such a substantive crime. Nonetheless, there is a reasonable chance that the jury may have convicted defendant of this so-called offense.

In the verdict form instructions (Instruction 54, Part II, Verdict Forms—Deliberate Homicide) the trial court told the jury:

"If you adopt the Guilty of Deliberate Homicide verdict form you are asked to find on that form whether the Deliberate Homicide was or was not by Means of Torture *as this is the most serious of the remaining charges of Deliberate Homicide made against the defendant.*

"After you have reached a verdict on the charges of Deliberate Homicide, whether Guilty or Non Guilty, you are still required to return a verdict on the charges of aggravated Kidnapping. Have your foreman date and sign the verdict form upon which you agree on the charges of Deliberate Homicide and take up the Charges of Aggravated Kidnapping." Instruction II, Verdict Forms—Deliberate Homicide. (Emphasis added.)

The verdict form required the jury to use a two-step process in its

decision. First, the jury was to determine whether or not defendant was guilty of the offense of deliberate homicide (without reference to any theory or theories used in arriving at this decision). (Part A, jury verdict form, supra.) Second, the jury was then to determine whether the homicide was committed "by means of torture" (Part B, jury verdict form, supra).

It appears that the verdict form contradicts Instruction 54, Part II. Instruction 54, Part II, told the jury to first determine if defendant was guilty of the *substantive offense* of deliberate homicide "by means of torture". On the other hand, the verdict form simply requires the jury to first find defendant guilty of deliberate homicide, and contains no reference to the theory or theories by which the jury could reach this result. Second, upon a determination that defendant was guilty of deliberate homicide the jury was then to determine whether the offense was committed "by means of torture." Furthermore, it appears that Instruction 54, Part II, above contradicts Instruction 6, supra. In any event, one can safely say that these instructions give no clear indication as to the path or paths the jury took in reaching its verdict.

Count 1 of deliberate homicide, alleged that defendant "knowingly or purposely" caused the death of Lana Harding. This allegation was made on the basis of section 94-5-102(1)(a). On the other hand, part of the allegations under Count 2, deliberate homicide, were predicated upon the felony-murder rule provided for in section 94-5-102(1)(b). This subsection of Count 2 alleged at least two ways in which the defendant committed a felony murder: either sexual intercourse without consent, *or* aggravated assault. The felony of aggravated assault was further divided into alternative methods of commission.

Instruction 22 provided the basic definitions of deliberate homicide as charged in Count 1 and as charged in a portion of Count 2. This instruction is a verbatim statement of section 94-5-102(1)(a) and (b). This instruction is legally sufficient. But a real wrinkle is thrown into a portion of the Count 2 charges because the additional charge is made that the deliberate homicide

was committed "by means of torture." In filing the charges and by the instructions, this deliberate homicide "by means of torture" was treated as a separate substantive offense.

Instruction 23 attempts to define the purported separate offense of deliberate homicide "by means of torture." It provides: "Deliberate Homicide by Means of Torture insofar as we are concerned with the definition thereof in this case is:

"Whoever purposely assaults another physically for the purpose of inflicting cruel suffering upon the person so assaulted for the particular purpose of enabling the assailant to either:

"(a) extort anything from such a person;

"(b) or to persuade such person against his or her will, or

"(c) to satisfy some other untoward propensity of the assailant,

"and in so doing the assailant causes the death of the person he assaults, in the law is guilty of the offense of Deliberate Homicide by Means of Torture, whether or not it was the purpose or intention of the assailant to cause such death.

"'Untoward propensity' means any perverse, wrong, bad or corrupt inclination or tendency." Instruction 23-Deliberate Homicide By Means of Torture Defined.)

There is absolutely no statutory basis for the language used in Instruction 23 attempting to define the crime of deliberate homicide "by means of torture." I do not know where the trial court found these definitions. Instruction 34, *Methods of Proof Applicable to Deliberate Homicide by Means of Torture*, not only repeats most of the language contained in Instruction 23, above, but also attempts to set forth the methods by which the element of this offense can be proved. The trial court specifically told the jury that since a particular purpose had to be proved, presumptions could not be used to prove the mental element involved. The last paragraph of the instruction provides:

"And if you find one or more of said particular purposes to have been proved beyond a reasonable doubt and that the defendant killed her while purposely so inflicting cruel suffering upon her, he

has committed the offense of Deliberate Homicide by means of Torture, *whether it was or was not his purpose or intention to kill her.*" (Emphasis added.)

I will have more to say concerning this instruction but presently it is sufficient to state that any analysis of the impact of the *Sandstrom*-type instructions must start out with the recognition that there is no crime in this state entitled deliberate homicide "by means of torture." One cannot tell whether or not the jury actually convicted defendant of this crime. But even if there is a reasonable chance, the conviction must be reversed for this reason alone, the *Sandstrom*-type instructions notwithstanding. Minimum standards of due process of law cannot tolerate a reasonable chance that defendant may have been convicted of and sentenced to death for a crime that does not exist.

For purposes of a *Sandstrom* analysis however, I will operate on the assumption that whether or not there is a substantive crime of deliberate homicide "by means of torture", is not an issue.

I start this analysis with what I believe is a required premise: unless an appellate court can declare beyond a reasonable doubt that the jury took a constitutional path to its deliberate homicide verdict (thereby avoiding application of the unconstitutional *Sandstrom*-type instructions), the conviction must be reversed. I see no other respectable way to approach the problem of constitutional error inhering in jury instructions.

Instruction 31 set the stage for all the *Sandstrom*-type presumptions which were to follow. It went into great detail as to how the mental element is proven in a criminal case. Part 2 of Instruction 31 specifically sets forth the *Sandstrom*-type instructions and tells the jury how it is to use them:

"2. *Proof by Presumption of Law.* (Deductions which the law expressly directs you to make from particular facts):

". . .

"[T]he law presumes, that is, the law expressly directs the jury to reason: That an unlawful act was done with an unlawful intent and

also that a person is presumed to intend the ordinary consequences of his voluntary act.

". . .

"Further, unless you are otherwise instructed with regard to a particular presumption, all presumptions are rebuttable; that is, they may be controverted and overcome by other evidence."

The trial court then zeros in on the particular offenses charged. Instruction 33, entitled *Method of Proof Applicable to the Offense of Deliberate Homicide*, sets forth two of the *Sandstrom*-type presumptions. The first presumption declares that:

". . . the law presumes that an unlawful act was done with an unlawful intent; that is, the law expressly directs you to reason from such unlawful act that the defendant acted with unlawful intent or purpose."

Thus, by this presumption, if the jury found that defendant either assaulted the victim or injured the victim, it was directed to find that defendant had an unlawful intent. The trial court also told the jury that this was a rebuttable presumption.

Instruction 33 takes another step and sets forth another unconstitutional presumption that would fall within the proscription of *Sandstrom v. State of Montana:*

". . . if you find . . . that the defendant, . . . voluntarily and unlawfully assaulted or injured Lana Harding, and if you further find beyond a reasonable doubt that the death would result as the ordinary consequence of such an assault or injury, the law presumes that, and expressly directs you to reason therefrom that the defendant intended to cause said death regardless of whether or not he actually had such an intent or purpose."

The trial court further instructed the jury that this also is a rebuttable presumption.

These fatal *Sandstrom*-type instructions were again drilled home to the jury by Instruction 38, *Methods of Proof Applicable to the Offense of Aggravated Assault*. The trial court told the jury:

"Since the offense of aggravated assault may be committed

either knowingly or purposely, the offense may be proved by showing the act was knowingly done, and the legal presumption that: 'An unlawful act was done with an unlawful intent, and the legal presumption that a person is presumed to intend the ordinary consequences of his voluntary act,' can be used to prove the mental state of knowingly." "Therefore, if you reason from facts proved in the evidence . . . that the defendant . . . unlawfully caused Lana Harding bodily injury either with or without a weapon, the law expressly directs you to reason therefrom that he acted with unlawful intent that is purposely; and if you further reason from facts beyond a reasonable doubt that the harm inflicted by him was such as ordinarily results from an act such as defendant's the law expressly directs you to reason that he intended the consequences of his act." Instruction 38.

The trial court also told the jury that these presumptions are rebuttable. (Instruction 38 becomes important when construed along with Instruction 34, which analysis will be set forth later in this dissent.)

Instruction 34 contains the methods of proof for the nonstatutory offense of deliberate homicide "by means of torture." The jury is specifically told that the particular purpose or purposes which must be proved under this charge, cannot be proved by presumptions, but only inferences can be used. The trial court tells the jury that the specific purpose to inflict "cruel suffering" (also a nonstatutory term), can be found by the use of inferences only. The trial court also defines the term "cruel suffering" (again a nonstatutory definition). It appears that the essence of this instruction is the direction to the jury that defendant is guilty of deliberate homicide "by means of torture" if the jury finds that he "had *purposely assaulted*" Lana Harding and inflicted *"cruel suffering" and* that the defendant had the particular purpose to inflict "cruel suffering" by his assault. (Emphasis added.)

These instructions are exceedingly confusing, misleading and inconsistent. Nonetheless, I must assume that the jury understood In-

structions 31, 33, 34 and 38, or at least did its best to follow the instructions.

The question then arises: By which process did the jury reach its verdict that defendant was guilty of deliberate homicide? It appears that the jury could have taken several paths, and that only one of the paths might not have been affected by the unconstitutional *Sandstrom*-type presumptions. Unless an appellate court can determine beyond a reasonable doubt which path the jury chose, it is in no position to declare that a jury chose the constitutional path and ignored the unconstitutional paths.

Instructions as to the use of jury verdict forms give some clue with relation to the steps taken in reaching the verdict, but not to the path or paths which the jury followed. Instruction no. 54, *Verdict Forms and Instructions As to Their Use*, stated in the introduction:

"In order to return a verdict, all twelve jurors must agree to the decision, *including the additional findings you are asked to make* on the Guilty of Deliberate Homicide verdict form and on the Guilty of Aggravated Kidnapping verdict form." (Emphasis added.)

This can be interpreted as requiring that the jury first determine whether or not defendant is guilty of deliberate homicide and then to determine if the homicide was committed "by means of torture." Instruction 54, Part II, *Verdict Forms—Deliberate Homicide* provides additional support for this two-step process.

Instruction 54, Part II, provides in relevant part:

". . . as only one death is alleged, only one Guilty of Deliberate Homicide verdict form is required.

". . .

"If you adopt the Guilty of Deliberate Homicide verdict form you are asked to find on that form whether the Deliberate Homicide was or was not by Means of Torture as this is the most serious of the remaining charges of Deliberate Homicide made against the defendant."

Again, a two step process is clearly indicated by this instruction.

When combining the two step process set forth in the verdict form with these instructions, a reasonable conclusion is that the jury first reached its decision that defendant was guilty of deliberate homicide and then found in the second step that the deliberate homicide was committed "by means of torture." It remains a mystery, of course, which path or paths the jury took in finding defendant guilty of deliberate homicide. There are, however, several more obvious possibilities. If one assumes that the jury followed this two step process in reaching its verdict, the probabilities are clearly in favor of the conclusion that the jury's verdict was tainted by use of the *Sandstrom*-type instructions.

Count 1 charged defendant with "knowingly or purposely" causing the victim's death. Instruction 31 told the jury that a voluntary act could be proved by the use of *Sandstrom*-type presumptions. Instruction 33, Part II, specifically told the jury that the mental state required for proof of deliberate homicide could be proved by use of *Sandstrom*-type presumptions. Thus, if the jury did find defendant guilty of Count I, an appellate court must assume that the jury reached this verdict by use of the unconstitutional presumptions contained within Instructions 31 and 33.

Several possibilities arise if the jury found defendant guilty of any of the alternative charges contained in Count 2. One of the alternative allegations in Count 1 is that defendant is guilty of deliberate homicide by reason of the application of the felony-murder rule. The State alleged that defendant had attempted, had committed, or was withdrawing from the commission of sexual intercourse without consent, a felony, or aggravated assault, a felony. If the jury followed a strict application of the felony-murder rule and thus found defendant guilty of deliberate homicide, it is *possible* that its verdict was not tainted by the unconstitutional *Sandstrom*-type instructions.

The felony-murder rule is set forth in Instruction 22, part (b) (a verbatim recitation of the statute), and in Instruction 33, Part III. Under Instruction 33, Part III, "knowingly or purposely" is not an

element of the offense. Technically, the jury was therefore not required to consult or use either Instruction 31 or 33 in reaching a verdict that defendant is guilty under the felony-murder rule. But an appellate court cannot determine whether the jury took this path to its verdict. Surely no appellate court could declare beyond a reasonable doubt that the jury took only the felony-murder route just described as its only path to its verdict.

Furthermore, if the jury took the felony-murder rule path to its verdict (thereby avoiding the use of the unconstitutional presumptions contained in Instruction 33) there is still a strong chance that it used the unconstitutional instructions contained in Instructions 37 and 38. Assuming the jury determined that defendant was guilty of deliberate homicide by committing, attempting to commit, or withdrawing from the commission of the felony of sexual intercourse without consent, the jury would have been required to use Instruction 37, *Methods of Proof Applicable to Sexual Intercourse Without Consent*. Instruction 37, Part II, specifically declares that proof that the act was *"knowingly"* committed *"can be made by presumption."* The *Sandstrom*-type presumption was set forth as the applicable presumption. Thus a felony-murder verdict in relation to sexual intercourse without consent would still not assure that the verdict was untainted by the unconstitutional presumptions.

The same analysis can be made in relation to a felony-murder conviction under the theory that defendant killed the victim while committing, attempting to commit, or withdrawing from the commission of aggravated assault. Instruction 38, Part II, *Methods of Proof Applicable to the Offense of Aggravated Assault*, specifically declares that proof that an assault was committed "knowingly or purposely" can be made by the presumptions either that "an unlawful act was done with an unlawful intent", or "the legal presumption that a person is presumed to intend the ordinary consequences of his voluntary act." Accordingly, a felony murder verdict in relation to aggravated assault would be tainted by the reasonable possibility that the jury used the unconstitutional presumptions contained in Instruction 38.

Another possibility is that the jury reached its verdict through the path cut in relation to the charge of deliberate homicide "by means of torture." Aside from the fact that such offense does not exist in this state, the State did charge that this offense was committed (Count 2, last paragraph), and the trial court defined the offense for the jury (Instruction 23) and set forth the method of proof required for this offense (Instruction 34, supra). Whether the jury took this path, is, of course, another mystery. Assuming that it did however, it could have followed an unconstitutional path or a constitutional path.

Instruction 34 permitted the jury to find defendant guilty of the offense of deliberate homicide "by means of torture" if it found the following elements: (1) That defendant had *"purposely assaulted* Lana Harding and inflicted cruel suffering" *and* (2) that defendant had one of the particular purposes to inflict "cruel suffering." The phrase "purposely assaulted" is important in relation to how the jury may have reached its decision.

If the jury first found that defendant "purposely assaulted" Lana Harding, and then found the particular purpose of the assault was to inflict "cruel suffering" it followed an unconstitutional path. A "purposeful assault" is defined in Instruction 38, *Method of Proof Application To The Offense of Aggravated Assault.* Part II of Instruction 38 specifically directs that the mental element of "purposely or knowingly" is established by the use of the *Sandstrom*-type presumptions. The trial court specifically told the jury that:

"Since the offense of aggravated assault may be committed either knowingly or purposely, the offense may be proved by showing the act was knowingly done, and the legal presumption that: 'An unlawful act was done with an unlawful intent, and the legal presumption that a person is presumed to intend the ordinary consequences of his voluntary act,' can be used to prove the mental state of knowingly. "Therefore, if you reason from facts proved in the evidence beyond a reasonable doubt that the defendant . . . unlawfully caused Lana Harding bodily injury either with or without a weapon, *the law expressly directs you to reason therefrom*

*that he acted with unlawful intent that is purposely*; and if you further reason from facts proved beyond a reasonable doubt that the harm inflicted by him was such as ordinarily results from acts such as defendant's, *the law expressly directs you to reason that he intended the consequences of his act.*" (Emphasis added.)

The instruction further provided that these are rebuttable presumptions.

It is clear therefore, that Instruction 38 permits the element of "purposely or knowingly" to be proved by the use of the *Sandstrom*-type presumptions. Thus, if the jury used either one of these presumptions in determining the first step that defendant committed a "purposeful assault", the verdict cannot stand. Any finding that defendant had the particular purpose to inflict "cruel suffering" would be tainted by the initial determination that defendant had committed a "purposeful assault" by the use of the *Sandstrom*-type presumptions.

It is possible, on the other hand, to construe the special jury finding that the deliberate homicide was committed "by means of torture", as embracing the general purpose of the defendant to assault the victim. If the jury followed this path, it need not have used the unconstitutional presumptions contained in Instruction 38, supra. It is, however, quite unlikely that the jury followed this path to its verdict.

Initially, it must be emphasized again that it remains a mystery as to the path or paths chosen by the jury in reaching its verdict. But neither do the instructions telling the jury how to proceed, or the verdict form itself, support a conclusion that the jury found defendant guilty of deliberate homicide "by means of torture" in one fell swoop. Rather, Instruction 54, Part II, tells the jury to first determine if defendant is guilty of deliberate homicide and if it is so to then determine if the deliberate homicide was committed "by means of torture." The two step process in the verdict form itself indicates, moreover, that the jury followed this process directed by the instruction.

There are, of course, many additional possibilities that the jury

found defendant guilty of more than one count or that it found him guilty of having committed the deliberate homicide in several alternative ways. The trial court specifically instructed the jury that this was permissible. Instruction 6, supra; Instruction 54, Part II, supra. Unfortunately, the trial court did not see fit to provide the appropriate verdict forms for the jury's use.

Because of the deficient record, only the jury knows which path or paths it followed in reaching the guilty verdict. An appellate court can only speculate as to what the jury did or did not do. It is impossible to determine therefore, that the *Sandstrom*-type presumptions which were sprinkled so liberally throughout the instructions used in this case, did not have an impact on the decision making process of the jury. Certainly no self-respecting appellate court can declare beyond a reasonable doubt that the *Sandstrom*-type instructions had no impact on the decision of the jury. As a matter of fact, because of the prevalence of these unconstitutional instructions, the probabilities are clearly in favor of a determination that the jury did use these presumptions as part of its decision making process.

I cannot in good conscience declare that beyond a reasonable doubt the *Sandstrom*-type presumptions had no effect on the jury's verdict. Indeed, the probabilities are that they did. But I must emphasize again, that separate basis exists to reverse the deliberate homicide conviction aside from the *Sandstrom* issue. There is a reasonable chance that the jury convicted defendant of the so-called offense of deliberate homicide "by means of torture." Such statutory offense does not exist in this state. If the jury did in fact convict him of this nonoffense it is a frightening prospect indeed that a defendant has been sentenced to death for a crime which does not exist. Due process of law requires for this reason alone that this conviction be reversed.

THE KIDNAPPING STATUTES AND CHARGES FILED IN THIS CASE

The kidnapping statutes involved in this case took effect on January 1, 1976. The crimes were allegedly committed on January

21, 1974. The kidnapping statutes are contained in sections 94-5-201 through 94-5-305, R.C.M.1947. Three of these statutes are pertinent to this case: section 94-5-302, creating and defining the crime of kidnapping; section 94-5-303, creating and defining the crime of aggravated kidnapping; and section 94-5-304, which provides that the death penalty shall be imposed if the victim is dead as a result of an aggravated kidnapping, and provided there are no mitigating circumstances.

The State charged defendant with two counts of aggravated kidnapping (Counts 3 and 4). Section 94-5-303, reads as follows:

"(1) A person commits the offense of aggravated kidnapping if he *knowingly or purposely* and without lawful authority restrains another person by either secreting or holding him in a place of isolation or by using or threatening to use physical force, with any of the following purposes:

"(a) to hold for ransom or reward or as a shield or hostage; or

"(b) *to facilitate commission of any felony or flight thereafter; or*

"(c) *to inflict bodily injury on or to terrorize the victim of another; or*

"(d) to interfere with the performance of any governmental or political function; or

"(e) to hold another in a condition of involuntary servitude." (Emphasis added.)

The penalty is provided for in subsection (2), which provides:

"(2) A person convicted of the offense of aggravated kidnapping shall be punished by death as provided in section 94-5-304, or be imprisoned in the state prison for any term not to exceed one hundred (100) years unless he has voluntarily released the victim, alive, in a safe place, and not suffering from serious bodily injury, in which event he shall be imprisoned in the state prison for any term not to exceed ten (10) years."

Section 94-5-304, referred to in section 94-5-303(2) above, sets forth the circumstances under which the death penalty may be imposed:

"A *court shall impose* the sentence of death following conviction of aggravated kidnapping *if it finds that the victim is dead* as the result of the criminal conduct unless there are mitigating circumstances." (Emphasis added.)

Count 3 of the aggravated kidnapping charges, supra, invokes section 94-5-303(b) and alleges several alternative ways by which the offense was committed. First, the State alleges that defendant had the particular purpose to commit or flee from the commission of the felony of sexual intercourse without consent. Second, the State alleges that the defendant had the particular purpose to commit or flee from the commission of the felony of aggravated assault. The allegations with respect to aggravated assault are further divided into alternative allegations relating to the particular purpose. By Count 3, 2(a), supra, the State alleges that the kidnapping was committed for the purpose of causing "serious bodily injury" to the victim. (See section 94-5-202(1)(a), R.C.M.1947.) By Count 3, 2(b), the State alleges that the kidnapping was committed for the purpose of causing "bodily injury" (as opposed to *serious* bodily injury, above) "with a weapon". (See section 94-5-202(1)(b), R.C.M.1947.) Furthermore, the "with a weapon" allegation is divided into an allegation that the weapon used was "a rope" or "a heavy weapon."

Count 3 adds, in the last allegation, that the victim died as a result of the kidnapping. The victim's death, however, is not an element of the crime of aggravated kidnapping.

Count 4 of the aggravated kidnapping charges, supra, invokes section 94-5-303(1)(c), and alleges that defendant, in kidnapping the victim, had "the purpose of inflicting bodily injury" on the victim, or "threatening or terrorizing" the victim. Count 4 also adds, in the last allegation, that the victim died as a result of the kidnapping. Again, however, the victim's death is not an element of the crime of aggravated kidnapping.

The State alleged that the victim died as a result of the kidnapping because it wanted the death penalty to be imposed should the defendant be convicted. But under section 94-5-304, supra, it is the

function of the court, not the jury, to make that finding in the event of a conviction.

## AGGRAVATED KIDNAPPING—IMPACT OF THE SAND-STROM—TYPE INSTRUCTIONS

It would of course be proper to give defendant notice that the State would seek the death penalty in the event of a conviction, but the issue should never have been submitted to the jury. The plain meaning of section 94-5-305, is that the court must make this determination of whether the victim is dead as a result of the kidnapping.

The jury had the choice of at least eight separate paths it could have taken to the verdict, as the defendant was charged in at least eight alternative ways. The trial court's instructions also permitted the jury to take two or more paths to its verdict. An analysis of Count 3 reveals that the jury had six separate choices; an analysis of Count 4 reveals that the jury had two separate choices. However, the applicable instructions provide no clues as to the choice or choices the jury may have chosen. And the verdict form upon which the jury returned its verdict, reveals absolutely nothing as to which path or paths it chose in reaching its verdict.

The trial court told the jury that it could convict the defendant on one or all of the separate charges (Instruction 6, *Statement of the Case*, supra). But even if the jury chose more than one path in reaching its verdict, the trial court told the jury to return only one verdict form (Instruction 54, Part III, *Verdict Forms—Aggravated Kidnapping*, supra). And the verdict itself is a simple declaration that the jury finds the defendant guilty of aggravated kidnapping:

"A. We, the jury, in the above-entitled cause, find the defendant Guilty of the offense of Aggravated Kidnapping as Charged.

"B. We further find that Lana Harding (did) (did not) die as a result of said Aggravated Kidnapping.

"(Strike out bracketed word or words that do not apply.)"

Assuming that the jury chose only one path by which it reached its verdict, because of the multiple charges and alternative ways

alleged, it had at least eight choices. Furthermore, if the jury chose more than one path to reach its verdict, and the instructions of the trial court explicitly allowed this approach, the possible combination of choices is multiplied many times over. Needless to say, it is impossible to determine which path or paths the jury chose. Before an appellate court can affirm the conviction here, it must be able to declare beyond a reasonable doubt which path or paths the jury chose and that the path or paths chosen were not impacted by the use of the unconstitutional *Sandstrom*-type jury instructions. An appellate court cannot in good conscience, make that declaration, and therefore the only choice is to reverse the conviction.

It should be sufficient to stop the analysis at this point and simply declare that the multiple choices available to the jury without any indication of what its choice or choices were, makes review impossible. Nonetheless, I will set forth some of the more obvious paths the jury could have taken, assuming, of course, that the jury followed or attempted to follow the applicable instructions.

The charges of aggravated kidnapping are set forth in Counts 3 and 4 of the Information, supra. There are quite a number of jury instructions which have a bearing on these charges.

Instruction 25 defines both the crime of kidnapping and the crime of aggravated kidnapping. The trial court told the jury that the crime of kidnapping requires that the act involved be done *"knowingly or purposely* and without lawful authority . . ." This definition is a verbatim recitation of section 94-5-302(1). In defining the crime of aggravated kidnapping the trial court told the jury that the act must be done *"knowingly or purposely,* and further, that it be done to accomplish one of the particular purposes charged, namely:

"(a) to facilitate the commission of a felony, or

"(b) to inflict bodily injury on the victim, or

"(c) to terrorize the victim."

This instruction is, for the most part, a verbatim recitation of the aggravated kidnapping statute, section 94-5-302(2), R.C.M.1947.

Instruction 29, entitled *Requirement of a Voluntary Act With a Mental State*, is a three page instruction setting forth the various mental states which must be proved for each of the charges filed against the defendant. In relation to the offense of kidnapping, Part IV of this instruction tells the jury that:

". . . *the voluntary act* (the secreting or holding of a victim in a place of isolation without lawful authority, or the holding of said person by physical force or threats thereof) be done *either knowingly or purposely.*" (Emphasis added.)

In relation to the offense of aggravated kidnapping, Part V of this instruction tells the jury that:

". . . *the voluntary act* (the secreting or holding the victim without lawful authority in a place of isolation, or the holding of said person by physical force or threats thereof), *be done either purposely or knowingly and in addition thereto* that it be done for one of the following particular purposes: either

"(a) to facilitate the commission of any felony (in this case sexual intercourse without consent of the victim, or an aggravated assault upon the victim), or

"(b) to inflict bodily injury on the victim, or

"(c) to terrorize the victim." (Emphasis added.)

Instruction 29, Part VI, provides that for the offense of sexual intercourse without consent, "that the *voluntary act* (sexual intercourse without consent) be done *knowingly.*" (Emphasis added.)

Instruction 29, Part VII, provides that for the offense of aggravated assault:

". . . *the voluntary act* (the infliction of serious bodily injury either with or without a weapon, or the infliction of bodily injury with a weapon) *be done either knowingly or purposely.*" (Emphasis added.)

With these statements as to mental state out of the way, the trial court then gave a long series of instructions as to the methods of proof which can be used to prove the mental element involved for each crime. The unconstitutional *Sandstrom*-type presumptions permeate this series of instructions.

Instruction 31, entitled *Mental State—Methods of Proof*, set the stage by explaining the kinds of evidence: Direct Evidence; Indirect Evidence; Presumptions; and Inferences. Part II of Instruction 31, entitled Proof by Indirect or Circumstantial Evidence, subheading (2), is entitled *Proof by Presumption of Law*. There, the trial court sets forth the unconstitutional *Sandstrom*-type instructions. In essence the trial court told the jury that it is presumed that the defendant intended the consequences of his "voluntary act", and that it is presumed that an unlawful act was done with unlawful intent. (Note: I have previously set out these presumptions in the discussion relating to the deliberate homicide conviction, supra.)

In each of the instructions containing the unconstitutional presumptions the jury was told that the presumptions were rebuttable. But the jury was not told that it could accept or reject the presumptions as it saw fit. The clear meaning of the instructions taken together is that the jury must use these presumptions to find the mental element and that it was within the power of the defendant alone to rebut these presumptions. Instruction 31 stated:

"2. Proof by Presumption of law. *(Deductions* which the *law expressly directs to be made* from particular facts):

". . .

". . . in addition thereto *the law presumes*, that is, *the law expressly directs the jury to reason:* That an unlawful act was done with an unlawful intend and also that a person is presumed to intend the ordinary consequences of his voluntary act." (Emphasis added.)

From these general instructions as to methods of proof the trial court then provided a long series of instructions describing for the jury the use of the presumptions in relation to each of the offenses charged. In this respect the words or phrases "voluntary act", "unlawful act", and "purposely or knowingly", or "intent", take on a real importance because the trial court told the jury to find the requisite mental element by the use of the unconstitutional *Sandstrom*-type instructions. These presumptions were hammered home to the jury again and again.

The State charged in one of the deliberate homicide counts and in the aggravated kidnapping counts that the defendant had a particular purpose in mind by committing the act. With respect to this particular purpose, the trial court in Instruction 32, told the jury that such particular purpose could never be presumed:

"In offenses which require proof of a particular purpose *the particular purpose required may never be proved by means of legal presumptions, but must be proved by means of inferences only.* In this case the offenses of: Deliberate Homicide by Means of Torture, and Aggrevated Kidnapping all require proof that the defendant committed the particular act charged for a particular purpose, *in addition to proof that he committed said act either knowingly or purposely.*" (Emphasis added.)

Instruction 36, entitled *Method of Proof—Aggravated Kidnapping*, provides as follows:

"The offense of Aggravated Kidnapping, *in addition to the proof required to prove the offense of kidnapping*, requires that the kidnapping was committed for a particular purpose.

"In this case Count 4 requires proof that the kidnapping was for a particular purpose either to inflict bodily injury on Lana Harding, or to terrorize her and Count 3 requires that the kidnapping have been for the particular purpose of facilitating the commission of a felony: either sexual intercourse without her consent, or to commit an Aggravated Assault on her.

"*Therefore, if you find* beyond a reasonable doubt *that the defendant, . . . did kidnap Lana Harding*, before he can be found guilty of the offense of aggravated kidnapping as charged in the Information, *you must further find* beyond a reasonable doubt *that he acted while having at least one of the particular purposes charged.*

"Since a particular purpose may never be presumed in law, the mental state of either knowingly or purposely secreting or holding for a particular purpose must be proved by inference only without the use of any presumptions.

"This means that if you find beyond a reasonable doubt, that the defendant did kidnap Lana Harding, you are permitted to deduce

or reason from any and all facts and circumstances proved in connection therewith that he did so with one or more of the particular purposes charged in Counts 3 and 4, and to find beyond a reasonable doubt that he committed the offense as charged." (Emphasis added.)

Although it may be otherwise deficient, Instruction 36, standing alone, is constitutional. It contains no *Sandstrom*-type presumptions. If an appellate court could determine beyond a reasonable doubt that the jury used Instruction 36 as its sole guide in finding the elements of the offense, it would then have to take a long, hard look as to whether the remaining *Sandstrom*-type instructions would or would not have tainted the jury verdict. If it knew the path chosen by the jury, an appellate court could declare that the jury's finding of a particular purpose, in order to convict defendant of aggravated kidnapping, embraced by necessity the general intent or general purpose to kidnap. The conscious object to restrain the victim (required for the crime of kidnapping) could arise by necessity from a finding of a particular purpose to either commit a forcible felony or to terrorize the victim. See section 94-5-303, supra. This would be a constitutional path, for the specific finding of a particular purpose would indicate that the jury found this particular purpose only by the use of permissive inferences as directed by Instruction 36.

The most obvious defect in this analysis is that no self-respecting appellate court could ever declare beyond a reasonable doubt that the jury took, this path to its verdict. There are, moreover, strong reasons to believe that the *Sandstrom*-type presumptions had an effect on the decision making process of the jury.

No one knows of course, which one or more particular purposes the jury may have found under the charges. For example, under Count 3 did the jury find that defendant had the "particular purpose either to inflict bodily injury on Lana Harding, or to terrorize her?" Or did it find both such purposes? Under Count 4 did the jury find that defendant had the particular purpose "to facilitate the commission of a felony: either sexual intercourse with Lana

Harding without her consent, or to commit Aggravated Assault upon her?" Or did it find both? Or did it find all of the particular purposes under Count 3 and Count 4? No appellate court would be so irresponsible to declare beyond a reasonable doubt which theory or theories the jury used in reaching its verdict.

It appears from Instruction 36, on the other hand, that the jury was told to make a two step analysis in determining whether defendant was guilty of aggravated kidnapping. First, the jury was to determine if defendant committed the offense of kidnapping (as opposed to aggravated kidnapping). Second, if the jury found he did commit the offense of kidnapping, it was then to determine if it constituted aggravated kidnapping. Thus the trial court told the jury by Instruction 36, supra:

"The offense of Aggravated Kidnapping, *in addition to* the proof required to prove the offense of kidnapping, requires that the kidnapping was committed for a particular purpose.

". . .

"Therefore, *if you find* beyond a reasonable doubt that *the defendant, . . . did kidnap* Lana Harding, before he can be found guilty of the offense of aggravated kidnapping as charged in the Information, *you must further find* beyond a reasonable doubt that he acted while having at least one of the particular purposes charged." (Emphasis added.)

This two step process for the jury's findings is further suggested by Instruction 29, Part V, and by Instruction 32, supra, which requires that the particular purpose be proved *"in addition to* proof that he committed said act either knowingly or purposely." (Emphasis added.)

Instructions 25, 29 (Part IV, and 35, are pertinent to the offense of kidnapping (as opposed to the offense of aggravated kidnapping). Instruction 25 sets forth the statutory definition of kidnapping (section 94-5-302, supra) and specifically states that the mental act required for its commission is "purposely or knowingly." Instruction 29, Part IV, provides that:

*". . . the voluntary act* (the secreting or holding of the victim in a place of isolation without lawful authority, or the holding of said person by physical force or threats thereof) *be done either knowingly or purposely."* (Emphasis added.)

Instruction 35, Part II, *Proof by Presumption* sets out the *Sandstrom*-type presumptions:

*". . .* if you find that the defendant, . . . without lawful authority, restrained Lana Harding, either by secreting her in a place of isolation, or by using physical force to hold her, the *law presumes that he acted therein with an unlawful intent, purpose or knowledge, and expressly directs you to so reason."* (Emphasis added.)

If the jury took a two step process to its verdict, and it appears that it was directed to do so, there can be no question that the jury may well have used the unconstitutional presumptions contained within Instruction 35 in reaching its decision that defendant committed the offense of kidnapping. Thus, the finding of intent (herein classified as "purposely or knowingly") to kidnap could well have been affected by the unconstitutional presumption. Certainly no court could declare beyond a reasonable doubt that the jury's finding as to "purposely or knowingly" was not affected by the unconstitutional presumption whereby the jury was specifically *directed* to "presume that he acted therein with an unlawful intent, purpose, or knowledge . . ."

Thus, if the jury first found the offense of kidnapping before proceeding to the next question of whether defendant had committed the offense of aggravated kidnapping, its finding of a particular purpose for aggravated kidnapping would be tainted by its reliance on the unconstitutional presumption in its first finding. Clearly, the verdict would then be built in part upon the use of an unconstitutional presumption.

It is perhaps more reasonable to view the instructions in a fashion that permits the general purpose to commit kidnapping to be embraced by the more specific particular purpose finding which is necessary for a conviction of aggravated kidnapping. If the question were not a constitutional one perhaps an appellate court could

reach this conclusion. But our duty here is confined to a determination beyond a reasonable doubt, as to whether or not the jury chose a constitutional path and ignored the unconstitutional paths to reach its verdict. There is abundant reasonable doubt in this case to believe that the constitutional error inhering in the instructions, was not harmless.

It is, moreover, not likely that the jury in reaching its decision as to a particular purpose, would not have run into the *Sandstrom*-type presumptions. If one assumes that the jury found the particular purpose as alleged under Count 4, to either commit sexual intercourse without consent or aggravated assault, or both, as part of its decision making process the jury could well have used the *Sandstrom*-type presumptions contained in Instruction 37 (sexual intercourse without consent) and 38 (aggravated assault).

By Instruction 37, the trial court told the jury that the *Sandstrom*-type presumptions could be used to prove the voluntary act of "knowingly" in relation to the offense of sexual intercourse without consent. By Instruction 38, the trial court told the jury that the *Sandstrom*-type presumptions could be used to prove the voluntary act of "knowingly or purposely" in relation to the offense of aggravated assault. Thus, the jury could have used these presumptions to conclude that defendant was guilty of sexual intercourse without consent, or aggravated assault, or both. With this decision made it would not be at all difficult to conclude that defendant kidnapped the victim for the particular purpose of accomplishing these offenses. At least, one cannot in good conscience declare beyond a reasonable doubt that these *Sandstrom*-type instructions had no influence whatever on the decision making processes of the jury.

## SUMMARY AND POSTSCRIPT

I concluded in my dissent in *McKenzie II* that we had denied defendant's constitutional rights at both ends of the procedural spectrum. First, we did not begin to fairly consider defendant's assertions that his rights had been violated under the Fourth Amendment and under Art. II, § 11 of the Montana Constitution.

Second, this Court did not fairly apply and fairly analyze the existing laws in relation to the death penalty. My views on these two questions are even more resolute. Now we can add to this our failure to fairly consider whether the barrage of unconstitutional *Sandstrom*-type instructions was prejudicial error. Our analysis and conclusion that the instructions were harmless can never be accepted by the United States Supreme Court as an appropriate standard. And now we can add to this the strong and frightening possibility that defendant may have been convicted of an offense and sentenced to death for a crime that does not exist in the laws of this state—deliberate homicide by means of torture. Never have I seen a case more replete with constitutional error.

I end this dissent with a postscript. In *McKenzie I* and *McKenzie II*, we held that defendant's procedural rights in relation to the death penalty are adequately protected by his right to take his case before the Sentence Review Board *after* we had reviewed his case on direct appeal. I dissented to this view because the sentence review statutes (sections 95-2501 through 95-2504, R.C.M.1947; 581 P.2d 1235 through 1266), clearly show on their face that they do not apply to review of a death penalty. Moreover, assuming that they do, they are defective because the defendant does not have a right to appeal to this Court from any decision made by the Sentence Review Board, a panel of district judges. Indeed, after defendant took his case to the Sentence Review Board, he petitioned this Court to review the Board's decision, and we declined. I dissented because any system of meaningful review must ·provide that the state's highest court will review the final death penalty decision. See order entered in *State v. McKenzie*, Cause No. 13011, dated February 20, 1979.

The majority view in *McKenzie I* and *McKenzie II*, and in Cause No. 13011, supra, rests, of course, on an assumption that the sentence review statutes indeed do apply to review a death sentence. But lo and behold, strange as it may seem, it is now the view of the Montana Supreme Court that sentence review statutes do not apply to a sentence of death and therefore that the Sentence

Review Board cannot review a death sentence. This is, of course, a 180 degree shift from *McKenzie I* and *McKenzie II*, and from *State v. McKenzie*, Cause No. 13011. This decision was recently made in the *Coleman* order. *State of Montana ex rel. Dewey Eugene Coleman v. Sentence Review Division of the Supreme Court of Montana*, No. 80-89, dated March 21, 1980.

In the *Coleman* case, this Court denied an application of another death penalty defendant for a writ of supervisory control, and properly so. Defendant is under 'sentence of death but also he has been sentenced to imprisonment by conviction on a separate count. Defendant petitioned this Court to stay proceedings in District Court for an execution date for the reason that defendant first had the right to go to the Sentence Review Board to have it review a non-death penalty sentence. We declined, holding that should his death penalty sentence be overturned in the Federal Court system, he could then apply to the Sentence Review Board to review his non-death penalty sentence. What is important however, is what we said in relation to the application of the sentence review statutes to a death sentence:

"The review application by relator was denied by the Sentence Review Division on the ground of lack of jurisdiction. It pointed out that *review of sentences is available only to persons sentenced to a term of one year or more in the state prison*, section 46-18-903, MCA, and that it had no jurisdiction to review death sentences. It also pointed to section 46-18-307, MCA, which provides for automatic review of death sentences by the Montana Supreme Court.

"We hold that the denial of review by the Sentence Review Division was correct. With respect to the death sentence, the only statutory agency with power to review is this Court. We have fulfilled our duties in that connection. *It would not only be extra-statutory but an anomaly were we to hold that the conclusions of this Court on review of death sentences were subject to later review by the Sentence Review Division of this Court.*" (Emphasis added).

Needless to say, a judicial system having fundamental fairness as one of its underpinnings, cannot long tolerate this kind of inconsistency—particularly where death itself is the underlying issue.

I leave it for others more perceptive and scholarly than myself to determine the status of constitutional law in this state in the wake of *McKenzie I* and *McKenzie II*, and now *McKenzie III*. Perhaps, however, an appropriate title for an article or book on the subject would be: *The McKenzie Rules: Not For General Application— Apply Sparingly.*